For the reasons assigned, the judgment appealed from is affirmed.

PONDER, J., takes no part.

19 So.2d 153

**STATE ex rel. RATHE v. JEFFERSON PARISH SCHOOL BOARD.**

No. 36885.

Dec. 13, 1943.

On Rehearing May 22, 1944.

Rehearing Denied June 26, 1944.

John E. Fleury, Dist. Atty., and Ernest M. Conzelmann, Asst. Dist. Atty., both of Gretna, for defendant and appellant.

L. H. Gosserand, of New Orleans, for relatrix and appellee.

ROGERS, Justice.

Miss Lillian Rathe, principal of the Metairie Grammar School in the Parish of Jefferson, was, on August 6, 1941, trans-

ferred to the position of teacher of history in the McDonogh Jefferson School which is situated in the City of Gretna across the Mississippi River from her home in New Orleans and from the Metairie Grammar School, where she was previously employed. The McDonogh Jefferson School had a student body composed of four pupils and a faculty composed of two principals. The salary of Miss Rathe as principal of the Metairie Grammar School was $177.92 per month for ten months in each year and her salary as a teacher of history in the McDonogh Jefferson School was $147.92 per month for the same yearly period. A few days after Miss Rathe was transferred to the McDonogh Jefferson School, she was again transferred, this time to the Jefferson High School as a teacher of miscellaneous subjects. The Jefferson High School is situated on the Jefferson Highway on the same side of the river the Metairie Grammar School is situated. The transfer of Miss Rathe to the Jefferson High School was not accompanied by any increase in salary, which remained at $147.92 per month. The several transfers of Miss Rathe, carrying with them a reduction in her salary of $30.00 per month, were made by the School Board without any charges having been preferred against her and without trial or hearing having been held as provided by the laws of this State.

The record shows that on July 23, 1941, certain parents of pupils attending the Metairie Grammar School filed a complaint with the School Board of Jefferson Parish charging Miss Rathe in a general way with

being incompetent and neglectful of her duties as principal and teacher in this school. On the day the complaint was filed, the School Board appointed a committee composed of the member of the Board from the ward in which Metairie Grammar School is located and the Parish Superintendent to investigate the complaints and report back to the Board. In the meantime, Miss Rathe called at the office of the School Board and obtained a copy of the complaints. On August 6, 1941, the Committee of the School Board reported, and, after hearing a number of witnesses, the Board unanimously agreed to transfer Miss Rathe to the McDonogh Jefferson School.

Shortly thereafter Miss Rathe filed a mandamus proceeding in the district court for the Parish of Jefferson against the School Board of the Parish seeking to be restored to her position as principal of the Metairie Grammar School and to her salary of $177.92 per month as of the beginning of the school term in September, 1941, in accordance with the provisions of the Teachers' Tenure Law—Act 58 of 1936. Following the institution of the suit, the Parish Superintendent of Schools prepared and filed written charges against Miss Rathe who was ordered to appear before the School Board on October 7, 1941, for the trial on the charges. Miss Rathe, accompanied by her attorney, appeared before the Board as ordered and filed exceptions of vagueness and of no cause of action to the charges of the Superintendent. The School Board maintained the exceptions and ordered the complainants to furnish specific dates and details as to the charges.

The Board directed the Superintendent on receipt of the charges, as elaborated, to further investigate them and report back to the Board. In the meantime the mandamus proceeding brought by Miss Rathe remained in statu quo and no trial was had thereon. The Superintendent, after consultation or conference with the complainants, made his report to the School Board, containing ten charges against Miss Rathe. The trial of the charges was fixed for November 28, 1941, and notice thereof was sent to Miss Rathe by mail. In response to the notice, Miss Rathe appeared before the School Board for trial on the specific charges filed against her by the Superintendent. After hearing witnesses for both sides, the Board unanimously adopted a resolution setting forth that it found that certain charges against Miss Rathe were sustained and that she should be demoted from the office of principal but retained as a teacher in the Jefferson High School with all tenure benefits. Miss Rathe then filed an amended and supplemental petition in her suit for a mandamus which was still pending in the district court so as to include all the incidents which happened subsequent to the filing of her original petition.

After a trial on the merits, the Judge of the District Court rendered a judgment in favor of Miss Rathe ordering that she be reinstated as principal of the Metairie Grammar School at the salary fixed by the Board for that school and that she be paid the full amount deducted from her salary by reason of her demotion, together with interest and costs. The School Board has appealed from the judgment.

The evidence shows that Miss Rathe is a graduate of Tulane University, holding a degree of Bachelor of Arts from that institution. She has been teaching in the Public Schools of the Parish of Jefferson for more than twenty years and has therefore acquired the status of a permanent teacher as provided by Act 58 of 1936, amending and reenacting section 48 of Act 100 of 1922.

The pertinent portion of Act 58 of 1936 reads as follows: "No permanent teacher shall be removed from office except upon written and signed charges of wilful neglect of duty, or of incompetency, or dishonesty, and then only if found guilty after a hearing by the school board of that parish in which the teacher is employed; which hearing, at the option of said teacher, may be private or public. Said teacher shall be furnished by said school board, at least fifteen days in advance of the date of said hearing, with a copy of the written charges."

In the present case none of the provisions of the law were followed by the School Board prior to the demotion of Miss Rathe. It was only after she had instituted her mandamus suit that written charges were preferred, on which she was tried with the result as we have hereinabove set forth.

The judgment appealed from is correct. In rendering the judgment, the judge of the district court has set forth his findings of fact and conclusions of law in a written opinion from which we quote, with approval, the following:

"It is not only true that Respondent (School Board) had absolutely disregarded the provisions of the law in removing Relator, (Miss Rathe), but it is obvious that some of the charges which were filed, apparently as an after-thought, failed completely to reveal that Relator was guilty of any infractions of rules or acts or laws upon which could be based the severe penalty which was imposed upon her.

"Certainly requests and demands of Parents' organizations for list of names and telephone numbers and library books, contained in items 1 to 4 inclusive, of the charges can not under any circumstances be construed as valid charges because neither Relator nor members of her faculty are under any obligations whatsoever to furnish any kind of information to these agencies; and, indeed, a request for a set of Junior classics for the use of the pupils and an additional request for funds from the Parents' Association to buy a lawn mower are not statutory causes for the removal of a teacher or principal, but, on the contrary, to the court they seem to be acts highly commendable. Certainly this is a manifestation of interest in the welfare of the school.

"Relator was further charged in item 5 with having absented herself from her class room (she was a teacher as well as principal) for one hour and fifteen minutes on April 28, 1941 and also with permitting one of her teachers to remain away from her own class room for the same length of time. This charge, however, was specifically denied and no adequate proof was offered to substantiate this charge, which was very vague and indefinite.

"It seems clear to the Court that it often becomes mandatory for a teaching principal to leave her own class room for the purpose of attending to other school duties, because, after all, the principal is the administrative head of the institution, and even if it were proved that she had been absent on that occasion such proof could hardly be construed as neglect of duty unless coupled with proof that she had wilfully absented herself on frivolous matters, foreign to her school duties, and certainly no such evidence was offered.

"The matters contained in item 6 of the charges relating to the slight injuries sustained by a child at play, during intermission, is to say the least, rather frivolous, and it certainly lacks the seriousness that attaches to an attack upon the professional status of a teacher. The evidence showed, however, that Miss Rathe administered 'First Aid' to the child who declined to go home, because he felt well enough to continue with his classes, and, who after eating his lunch, remained in school until taken home by his mother, who admitted that the child had sustained no serious results.

"The charge contained in item 7, is naught more than a futile effort to make use of age-old alleged complaints by patrons of another school from the principalship of which relator had been promoted and of which said complaints she had never been apprised by any of the School Officials.

"The only effect of such a complaint is to reveal a dearth of real, valid and cogent

charges against the efficiency and integrity of the Relator.

"The allegations contained in items 8, 9 and 10 of the charges deal with discrepancies in the school record of students. The facts are that these records were kept by one of the other teachers and that although there might have been clerical errors due to inadvertence, relator's attention was never called to the alleged errors either by the Superintendent or by the School Board.

"It was also revealed by Superintendent Higgins that he seldom checks over the records of principals and that this was an exception. We must, therefore, conclude that absolute accuracy is not considered sacramental.

"It is also a matter of record that the question of inaccuracy in the records of the relator came as an after-thought and must have been discovered only after she had filed these proceedings and after the original charges in which they are not contained or enumerated had been dismissed by the School Board as vague and incomplete and indefinite.

"The Superintendent's careful audit offered in evidence showed that the twenty-five pupils in Miss Rathe's own class consisted of fifteen promotions, seven conditions and three failures, yet the school record produced by Mr. Higgins, at the trial revealed the names of twenty-six pupils, obviously, an error in his own audit. Miss Rathe, however, testified that this record book had been out of her hands for months, and, that from it, certain pages were missing, and that this record of the members

of her class was definitely incomplete. The missing names of eight other students were supplied by a personal record kept by the Relator and these being transients or part-time students evidently had brought the average up to the number twenty-nine, contained in the yearly record, compiled by one of the assistants, and submitted at the end of the session by the Relator to the School Board. The complaint was that the 'session' report showed twenty-nine pupils, yet the class record disclosed only twenty-five pupils.

"It is inconceivable that a teacher, who had given the best years of her life to educational service in the public schools of Jefferson Parish, the value of which services had most certainly been recognized by a former superintendent, J. C. Ellis, and by the School Board, and had been duly rewarded by several promotions, should have been shunted aside without even being apprised by the Superintendent or other board officials of alleged misconduct or wilful neglect of duty or other violations of the laws governing teachers.

"A teacher's task is a sacred trust, her qualifications must be both moral and mental, and the law imposes upon her the further requirement of three years of successful experience in order that she might attain permanency. Certainly a School Board, acting in a judicial capacity, should deliberate fairly and resolutely, and, with keen discernment, before forming any conclusion that has the effect of destroying the efficacy of a teacher's morale and of impairing her usefulness. To do otherwise is an inexorable indiscretion.

"Neither the whims and fancies of patrons nor the idiosyncrasies of the members of the faculty of a school are entitled to consideration in the determination of issues involved in the tenure of a teacher. The laws of the State and the welfare of the pupils alone should govern and guide those who pass upon charges properly brought. A competent and conscientious teacher and principal cannot be transferred or demoted without strict compliance with the letter and spirit of the law.

"From the testimony of the teachers who were witnesses for respondent, nothing can be culled which was relevant to the issues involved and, all evidence offered to show discrepancies in the records of Relator, even if proof was sufficient, would scarcely amount to more than clerical errors, due to inadvertence, for which relator could hardly be held accountable, for the reason that the records were actually kept by another teacher.

"In any event, the charges of wilful error and wilful neglect of duty were not sustained and not a scintilla of evidence was offered to show that Relator, Miss Rathe, was guilty, in the slightest degree, of anything which savored of incompetency, neglect of duty or turpitude.

"A demotion from one position to another when accompanied by a substantial reduction in salary is tantamount to a dismissal and no teacher or principal can be removed from office except upon charges of wilful neglect of duty or of incompetence or dishonesty, and, in the instant case, the facts adduced definitely failed to

support such charges. The Court in support of its findings cites the following cases recently decided by the appellate courts. State ex rel. McNeel v. Avoyelles School Board, 199 La. 859, 7 So.2d 165; Bass v. Vernon Parish School Board, La.App., 194 So. 74; State ex rel. Nobles v. Bienville Parish School Board, 198 La. 688, 4 So.2d 649."

For the reasons assigned, the judgment appealed from is affirmed.

HIGGINS, J., concurs in the decree and assigns reasons.

HAMITER, J., concurs in the decree.

ODOM, J., dissents.

FOURNET, J., absent.

HIGGINS, Justice (concurring in the decree).

Controversies arose between the principal of the Metairie Grammar School and thirty of the parents and six of the teachers of the pupils of the school as members of the Parent Teachers' Association. As a result of a number of verbal complaints and the written charges of incompetency and willful neglect of duties as principal contained in the petition signed by thirty of the parents, the fourteen members of the School Board, acting upon the advice of their legal advisor, the District Attorney, and an opinion of the Attorney General's office that the Board had authority, unrestricted by the Tenure Statute—Act 58 of 1936—to transfer a principal to a position

as a regular permanent teacher, unanimously transferred the relatrix from the principalship of the Metairie Grammar School at a salary of $177 per month to the position of a regular teacher in the Jefferson High School at a salary of $147 per month. Upon the protest of the relatrix' attorney that the School Board should have complied with the provisions of the Tenure Law in making the transfer, the School Board instructed its Eighth Ward member and the Superintendent of Education of the Parish to investigate the complaints and charges made against the relatrix and formal specific charges of neglect of duties and incompetency as principal were filed against her and a trial was held before the School Board, in accordance with the provisions of the Statute. The Board again unanimously voted to transfer the relatrix from the principalship to the position of a teacher in the Jefferson High School with benefit of all tenure rights. The mandamus proceeding filed by the relatrix against the Board to be restored to her position as principal and for a monied judgment representing the difference between amounts of the salaries from the time that she was prevented from serving as principal was then heard by the trial judge on the same issues. Five of the seven teachers of the Metairie Grammar School and three of the complaining parents testified against the relatrix concerning the charges of willful neglect of duties in not keeping the proper records required by the State Board of Education and to charges of incompetency as principal, pleaded as a defense by the School Board in the suit. The testimony

of the Superintendent of Education consisted of an explanation of the rules of the State Board of Education for fixing the salaries of teachers and principals and the percentage computation of daily average attendances of pupils at the school based upon the records the principal filed with the School Board and those kept by her at the school. One of the parents and a teacher testified in her behalf to the effect that she had co-operated with them, was a competent principal, and had not neglected to keep the proper records. The relatrix denied the charges and testified that the school in question was a new one consisting of a principal and seven teachers and pupils having a daily average of 159.5%. The classes from the Kindergarten through the Seventh Grade had to be organized, the Parent Teachers' Association formed and a library established. The large grounds around the school, near the public highway, were being filled with earth hauled by several trucks. One of the United States Government Draft Boards was conducting its business on the second floor of the school building and different types of people were going in and out of the place regularly. The principal was not granted any extra time for any administrative and executive work and taught the Seventh Grade.

Under the trying conditions of organizing the school, supervising the children, and the adjustment of the teachers, pupils and parents to the new environment and situation, dissension and lack of harmony arose between the principal and the six teachers and thirty parents. There were discrepancies in the records filed by the relatrix with the School Board and those kept by her at the school. The former showed 159.5% daily average attendance and the latter, 145.5%. This was shown by the Superintendent of Education's audit of these reports and records, but the difference between them was explained by the relatrix from personal records concerning "transient pupils." Apparently, these students were not listed on the school record and if so, the two pages concerning them were missing. These records of the daily average attendance were kept at the school and remained there after relatrix left. The Superintendent's audit covered only the reports filed by the principal with the School Board and those kept at the school as required by the State Board of Education. The only other way the School Board and the Superintendent of Education could completely check the correctness of these types of records would be to station a person in each of the school rooms of all the schools in the parish throughout the year to see that each teacher properly and correctly reported the attendances and absences. Obviously, this would be most difficult, if not impossible, from a financial view point. The matter must be largely left to the care, interest and honesty of the teachers and principals. The relatrix' records were checked because another teacher said they were inaccurate and after her attention was called to the discrepancies, she refused to correct them and insisted on making up the differences by reporting that several pupils had been conditioned.

The point that relatrix was transferred to the McDonogh Jefferson School without formal hearing, as required by the Tenure Statute, passed out of the case because the School Board, upon her attorney's complaint, fully complied with that law. The relatrix was the only witness who said the McDonogh Jefferson School had two principals and four pupils. It appears that the schools were on vacation when the Board first took action on the charges and was using the McDonogh Jefferson School as a sort of clearing place for transfer of teachers and students until they could be properly placed before the opening of the schools in the Fall. The Board was obviously not trying to operate a school with two principals and four students, especially when the school was on vacation. The relatrix admits that within three days after her assignment to the McDonogh Jefferson School the Board assigned her to the Jefferson High School as a teacher.

The record completely refutes the statement that the charges were frivolous and not supported by "a scintilla of evidence." Four of them were serious and backed by substantial testimony of reputable teachers and parents. The eight year old third grade boy sustained a severe head injury and wound in a collision with another boy. The wound was about one half inch in length and bled "profusely." His teacher wanted to report the accident to his mother and send him home to receive medical attention and observation for a probable concussion of the brain or fracture of the skull. The principal ordered him to remain in school. The mother took her child home at noon about one and one half hours after the accident and he was kept at home under medical observation for two or three days.

The charges of failure to co-operate with the six teachers under her (relatrix) and the parents of the children were not based upon whims and caprice. The condition was affecting the proper operation of the school.

The very purpose of the Parent Teachers' Association is to co-ordinate the efforts of the teachers and parents to make the school operate harmoniously and effectively. Neither the principal, the teachers, nor the parents should try to dominate each other. All of them have their proper places in the school system and their respective duties to perform. If this were not so, the State Board of Education would not have recognized the Parent Teachers' Association.

It will not suffice to say that the keeping of the attendance records required by the State Board of Education is to be lightly regarded. The principal is the one under whose supervision the records are made up and filed with the School Board. The principal's salary is partly based upon them for she received $147 per month base pay and $15 per month extra for each certain designated percentage of the daily average attendance. In this case, it amounted to $30 per month.

It was also necessary that the principal keep a record of the names and addresses of the parents of the children attending this school for obvious reasons. It was not

unreasonable for the officers of the Parent Teachers' Association to request a copy of them. One of the mothers and officer of the Association showed her co-operation by writing up a list from the data furnished her by the respective teachers.

Perhaps, under normal conditions and circumstances, those unfortunate misunderstandings and errors in the records and judgment would not have taken place.

The rule of law governing the trial of a civil case in the district court is that a party must prove his case by a preponderance of the evidence. But, on appeal, the rule is that where only issues of fact are involved, it must be shown that the judgment is manifestly erroneous before it will be reversed by the appellate court. Giving full effect to this well established jurisprudence, and due consideration to the abnormal conditions out of which the trouble arose and that the relatrix had been a teacher for about twenty years, it may be said that the judgment of the trial court is not manifestly erroneous.

For these reasons, I concur in the decree.

## On Rehearing.

HIGGINS, Justice.

The relatrix, a permanent teacher under the Teachers' Tenure Statute, Act 58 of 1936, instituted mandamus proceedings against the Parish School Board to be reinstated as the principal of the Metairie Grammar School, alleging that she had been illegally and unjustifiably demoted by being transferred to the Jefferson High School as a teacher with a reduction in salary from $177.92 to $147.92 per month.

The defense is that after a full hearing of the charges against the relatrix, in accordance with the Teachers' Tenure Statute, the School Board, consisting of fourteen members, unanimously decided that the complaints of incompetency and wilful neglect of duties as principal of the Metairie Grammar School were proven and transferred her from the position of principal to that of a teacher, with retention of her tenure rights as a teacher but with the attending reduction in salary, in accordance with the State Board of Education's salary schedule regulations.

The trial judge annulled the ruling of the School Board and issued a writ of mandamus to compel the School Board to reinstate the relatrix to her former position as principal and rendered a monied judgment in her favor for the difference between the salaries during the period of time that she was prevented from serving as the principal of the Metairie Grammar School.

The respondent appealed and on the original hearing here, the judgment of the district court was affirmed by a divided court. In its application for a rehearing, the respondent emphasized the points that where a Board is granted executive and administrative functions by statute and acts in good faith upon substantial and serious evidence in arriving at its solution of an executive and administrative problem, the Court should not substitute its judgment for that of the Board, particularly

where the members of the Board are much better informed and qualified, because of their particular knowledge and experience in discharging and performing the duties and functions of their offices. The case of State ex rel. Thoman v. State Board of Certified Public Accountants, 172 La. 261, 134 So. 85, 86, is cited, where this Court said:

"* * * On the trial of this case the evidence was so convincing, that it was virtually conceded, that his general reputation was that of a man of good moral character. On the other hand, we have no right to substitute our judgment for that of the board of certified public accountants, as to whether the relator is worthy of a C. P. A. certificate. All that we have to decide in such cases is whether the board discriminated arbitrarily against the applicant for a certificate, or exercised its discretion fairly and impartially. Whether the board's judgment was exercised wisely or unwisely is not for us to decide. State ex rel. Eberle v. State Board of Certified Public Accountants, 171 La. 318, 131 So. 32."

A rehearing was granted and on the reargument of the case a more complete analysis of the evidence and law was presented than originally.

Act 100 of 1922 creates the State Board of Education and the Parish School Boards, defines their respective duties and powers, and places the latter under the general supervision of the former. Parish School Boards have the authority to establish public schools and provide for their maintenance and operation and are entrusted with the administrative and executive functions in conducting the public school system in the parish. The Board has the authority to employ, suspend and discharge teachers and it is its duty to supervise their work. The statute grants to the State Board of Education the authority to make rules and regulations not inconsistent with the Constitution and laws of this State for the guidance and direction of the School Boards and the teachers. The teachers and principals of the schools, the Parish School Board and the State Board of Education are required to keep certain records. Heretofore, under the above statute the School Board has granted discretionary power in employing and discharging teachers, but Act 58 of 1936, generally known as the Teachers' Tenure Statute, restricted the Board's right to discharge a teacher. The pertinent provision reads as follows:

"No permanent teacher shall be removed from office except upon written and signed charges of wilful neglect of duty, or of incompetency, or dishonesty, and then only if found guilty after a hearing by the school board of that parish in which the teacher is employed; which hearing, at the option of said teacher, may be private or public. Said teacher shall be furnished by said school board, at least fifteen days in advance of the date of said hearing, with a copy of the written charges. Said teacher shall have the right to appear before said board at said hearing with witnesses in his behalf, and with counsel of his selection, all of whom shall be heard by said board at said hearing; provided further, that it is not the intent of this act to impair the

right of appeal to the court of appropriate jurisdiction."

In interpreting the above provisions of the 1936 statute, this Court has held that they are applicable to cases where a principal is demoted to a position as a teacher and his salary reduced. State ex rel. McNeal v. Avoyelles Parish School Board, 199 La. 859, 7 So.2d 165 and State ex rel. Nobles v. Bienville Parish School Board, 198 La. 688, 4 So.2d 649.

While Act 58 of 1936, the Teachers' Tenure Statute, provides for a probationary period of three years before a teacher acquires a permanent status, there is no such provision in the State with reference to the employment of a principal of a school. It appears, however, that the State Board of Education's regulations require a teacher to have a minimum of five years' experience before being eligible to become a principal.

The record shows that the relatrix had been a teacher in the public schools of Jefferson Parish for about eighteen years at the time she was promoted by the Parish School Board to the principalship of the Eighth Ward Grammar School at a salary of $177.92 per month. After serving in that capacity for one session (1938–1939), upon written complaints and the petition of 51 parents of the Parent Teachers'. Association of that school, the School Board transferred the relatrix, with the same salary, to the position as principal of the Metairie Grammar School, which had just been completed. This school had a corps of eight teachers, including the principal. During and at the end of the session 1939–1940 there were verbal and written complaints made to the School Board by thirty of the parents and six of the teachers of the pupils of the Metairie Grammar School against the relatrix, charging her with incompetency and wilful neglect of duties as principal. In July, 1941, when the schools were in vacation, the School Board had the complaints investigated. The Assistant Attorney General had rendered an opinion under the authority of Section 41 of Act 100 of 1922, wherein he ruled that: "Under Act 58 of 1936, amending Section 48 of Act 100 of 1922, 'Teachers' Tenure Law', there is no requirement that a teacher be retained in any particular position in any particular school, as long as the teacher who has become a permanent teacher is retained in the employ of the School Board of the parish in which she has acquired her permanent status. It is therefore our opinion that a teacher could be transferred from one school to another in the same parish." On August 6, 1941, a hearing was held before the Board. Acting upon the advice of her counsel that the procedure of the Board was not in conformity with the provisions of the Teachers' Tenure Act, the relatrix did not appear but her friends presented certain witnesses and the Board heard testimony on both sides of the controversy. It then unanimously transferred the relatrix from the position as principal to that of a teacher in the McDonogh-Jefferson School, which was used as a clearing place for the transfer of pupils and teachers for the incoming session. She admits being there only three days when she was assigned to teach in the Jefferson High School, ac-

cepting under protest. Shortly thereafter the relatrix instituted the present mandamus proceeding complaining that the Board had not complied with the Teachers' Tenure Statute. Thereupon the members of the Board, acting upon the advice of the District Attorney, and with his assistance, had written charges prepared and served upon her, in accordance with that law, ordering her to appear for trial on October 7, 1941. On that date her attorney filed exceptions of vagueness and of no cause of action to the charges. The exceptions were maintained by the Board and the complainants were ordered to furnish certain information and dates in detail. The Board ordered its Eighth Ward member and the Parish Superintendent of Education to investigate the charges and make a report. By agreement between counsel, the mandamus proceeding remained status quo. After consultation with the complainants, the Superintendent of Education, in accordance with the Board's instructions, made a report containing ten specific charges against the relatrix. The trial was set for November 28, 1941, and the relatrix was notified. She and her attorney appeared before the Board on the date set and after hearing the witnesses presented by each side, it unanimously adopted a resolution setting forth that it found that certain of the charges against the relatrix were sustained and she was demoted from the office of principal to a teacher in the Jefferson High School, with all tenure benefits. The relatrix, through her counsel, then amended and supplemented her petition for mandamus pending in the court so as to set forth the new

and additional facts. The District Attorney, as legal advisor of the School Board, answered the original and supplemental petitions, reiterating the ten separate charges filed against her with the School Board and averring that she had been previously in similar trouble with the Parent Teachers' Association of the Eighth Ward Grammar School, and that the Board had acted within its legal rights in good faith upon the great preponderance of evidence for what it considered to be the best interest of the school. In the district court, six of the seven teachers under the relatrix and several parents whose children attended her school testified against her and she, one teacher and one parent testified in her behalf.

The point that originally the School Board did not comply with the Teachers' Tenure Act in demoting the principal by transferring her to another school as a teacher completely passed out of the case when the district attorney advised the Board to begin anew and from then on rigidly followed every requirement of the Teachers' Tenure Statute.

The first charge we shall discuss is neglect and failure by the principal to keep proper attendance and absence records required by the provisions of Act 100 of 1922 and the rules and regulations of the Louisiana State Board of Education. This Board furnishes three types of printed forms to the respective School Boards, principals and teachers in the public schools throughout the State. The first one is called the Daily Register upon which the teacher of each class must make a record

of the name and address of each pupil and his parents' names, each day the pupil attends school or is absent therefrom, number of times tardy and his scholastic record. The Daily Register remains in the schools in the custody of the principal, as a permanent record. The second form is called the Principal's Monthly Report, which must be made up and filed by the principal with the School Board at the expiration of each school month. This report gives the name of the principal and the school, the month and year, but does not contain the names and addresses of the pupils, reciting only the number of boys and girls enrolled in each class from Kindergarten through the Seventh Grade, the aggregate days of attendance of the pupils for the month and the aggregate days of absence of the pupils for the month, together with the average attendances and absences in percentages. It is the duty and responsibility of the principal to make up and file this report with the School Board under penalty of having her salary withheld for wilful neglect or failure to file the report. Section 50, Act 100 of 1922. The third form or printed blank furnished by the State Board is designated as the Principal's Session Report, which, when filled in, shows the name of the school, the principal and the session covered, the number of classes, the number of boys and girls, respectively, in each class, the number of pupils dropped or transferred to other schools and new pupils acquired, the net gain or loss of pupils, the aggregate days of attendances, aggregate days of absences for the session, the daily average attendance and absence for the

session, the daily average percentage of attendance and absence, respectively, and the number of pupils promoted, conditioned and failed in scholastic work. It is likewise the duty of the principal under the statute and the State Board's regulations to make and file this report with the Parish School Board.

The foregoing records are important because the information contained therein must be transferred to the State Board of Education by the Parish School Board as a duty under the statute and the State Board's regulations. Based upon the data contained in these reports, the State Board of Education determines the number of educable children, the amount of money to be allocated to each school, and the number of teachers required to teach in the respective schools so that they will not be overstaffed. The salary of the principal is partially based upon the daily average attendance of pupils in the school. In this case, the principal's basic pay as a permanent teacher of more than ten years experience with a degree was $145.77 per month and she was entitled under the uniform salary schedule regulations to $15 per month additional for each specified percentage of daily average attendance. Therefore, it is necessary that these reports be kept accurately and the principals of the schools were so informed and instructed.

Relatrix elected to teach the sixth grade in the Metairie Grammar School for the session commencing September 10, 1940 and ending June 4, 1941. As the teacher of that class, it was her duty and responsibility to keep a correct daily register of her class

upon the printed blank form furnished by the State Board of Education, and this she did in her own handwriting. This register, which the regulations required to remain on file in the school in her custody as principal, shows an aggregate absence for the session of 307, whereas the principal's session report for the same class shows only 115 absences. The relatrix, in her testimony, sought to explain the discrepancy on the ground that there were ten transient pupils who attended her class at various intervals during the year ranging from 30 days to 90 days and, in one instance, six months, and that the two pages covering them were missing from her daily register record. It is absolutely impossible to reconcile her daily register showing the total absences of 307 in her own class with her session report of only 115 absences for the school year. The relatrix' explanation certainly does not clarify the matter because if the absences of ten additional transient students, who irregularly attended the class from only one to six months, respectively, were added to the total absences of 307 shown on her own daily register, the inevitable result would be that the total number of absences for the year would be increased and not reduced. It must also be remembered that at the time she had the session report made up and filed with the School Board, she herself was in custody of the complete daily register records. The relatrix also stated that she delegated to the third grade teacher, who volunteered her services, the task of making the principal's monthly reports and session report to the School Board. The relatrix admitted that

she filled out in her own handwriting the initial part of each of these ten reports but disclaimed any responsibility for any inaccuracies or misstatements contained therein because she entrusted the work to her subordinate. This teacher admits that she filled out the reports but states that she did so in accordance with the principal's instructions. This teacher is corroborated by another one.

The evidence shows that each teacher would return on a memorandum to the principal the total number of days the pupils attended and were absent from school for the month and from these memorandums the principal's monthly report was made up. It is also impossible to reconcile the principal's monthly report covering the respective classes with the daily register kept by each teacher covering the attendances and absences of the pupils. For instance, relatrix' own daily register covering the sixth grade shows total absences of 307 for the year, whereas her principal's monthly report filed with the School Board shows an average daily attendance ranging between 95% and 100% each month. The principal's session report shows an average attendance for the school year of 98% based upon the reported absences in her class of only 115, whereas her own register kept in her own handwriting shows 307 absences.

An examination of the daily registers kept by the other teachers of the classes from the first through the seventh grades, inclusive, likewise reveal that the total monthly absences as shown thereon cannot be reconciled with the principal's nine monthly reports and her session report, the

total number of absences on the daily register for each class being much greater than the total absences reflected on the principal's monthly and session reports. Accepting the figure of 342 absences in the kindergarten where the teacher was not instructed by the principal to keep a register and taking the total number of absences for the other seven classes, we have a toal of 2934½ absences for the session, whereas the principal's session report, which is practically the same as the principal's monthly report in that respect, shows a total of 1956 absences, or a difference of 978½ absences.

Under the law and the regulations of the State Board of Education, the duty and responsibility was on the principal of the school to make correct and accurate reports of these important matters. If she chose to delegate the work to another teacher, it was still her responsibility and duty to check the reports before filing them with the School Board, which, in turn, transmitted the information to the State Board of Education. A cursory examination of her own register and the nine monthly reports, or the session report, would have revealed to her that all of the principal's reports and the session report were incorrect. By simple calculation, with this information before her, she could have also determined that ·she did not have 159.7% daily average attendance for the session, as she reported. It was important that this data be accurate because she also knew that $30 of her salary per month was predicated on the correctness of that figure. A competent executive

certainly would have discovered and corrected these obvious errors which were repeated over a period of nine months.

It is stated that the question of faulty records of the principal was an afterthought. It must be remembered that the daily register remains as a permanent record in the respective schools in the principal's custody. These records are not forwarded to the School Boards with the principal's monthly and session reports. The School Board had the monthly reports checked against the session report and they were identical except for minor errors. It was only after complaints and investigation were made that the Board became apprised of the great disparity between the daily register and the monthly and session reports, having depended upon the thoroughness of the principal in making the required reports to it. It is sufficient to say that when the relatrix, through her attorney, insisted that the general charges be. made more specific as to neglect of duty and incompetency, the particular charge of neglect and incompetency in failing to keep proper and correct records was made against the principal both in the trial before the School Board and the district court. Consequently, the only issue in that respect before us is whether or not the proof introduced before the School Board and the lower court was sufficient to sustain the charges.

The complaints of the six teachers, who testified against the relatrix, were that she was arbitrary, abusive and domineering; that she corrected and criticized some of the teachers in the presence of their pupils

in class; that on one occasion, in the presence of others, she told one of the teachers she was ignorant; that when the other teachers expressed views contrary to her own opinion, she openly and hostilely accused them of insubordination; that when certain boys flagrantly misbehaved, instead of assisting the teacher in maintaining discipline, she upheld some of them; and that while in the beginning of the session she co-operated with the teachers, as the months passed she became more dictatorial, unreasonable and non-co-operative to the point where it seriously interfered with them in the proper discharge of their duties. They also stated that they accurately and properly kept their daily schoolregisters and reported the correct figures of the attendances and absences to the principal.

During February 1941, an eight year old boy in a collision with another boy sustained an half inch cut in his head, which was described as bleeding profusely. The teacher of the third grade, who taught him, administered First Aid by putting compresses on the wound to stop the flow of blood, which continued in receding degrees from the 10:30 o'clock recess until noon. The teacher suggested to the principal that the child's parents be notified in order that the little fellow might receive medical attention for probable concussion of the brain or fracture of the skull. While it is elementary that head injuries are to be regarded as serious, she was summarily overruled by the principal, who ordered the child to remain in school. As the teacher was well acquainted with the boy's mother, while going to lunch at her own home, she

informed the mother that the child had been injured. The mother promptly went to the school and took the child home where he remained under observation for two or three days. This mother was one of the parents who signed the petition to have the principal removed.

The parents of the Parent Teachers' organization made similar complaints of domination and arbitrariness on the part of the principal. The Executive Committee, through its proper officer, the secretary of the organization, requested the names and addresses of the parents and pupils attending the school but it was not forth-coming from the principal and the parent had to make up the list from the records of the teachers of each class. The parents wanted to have a Hallowe'en entertainment at the school, but this was opposed by the principal. When the Executive Committee wanted to spend certain funds for books for the library, the parents testified that the principal insisted on purchasing a lawn mower when the grounds around the school were in no condition to use one on them.

The School Board, in its answer and testimony, also identified the petition and written charges made against the relatrix as the principal of the Eighth Ward School by 51 parents, but upon objection of the attorney for the relatrix the trial judge ruled it out as being immaterial and irrelevant. A bill of exception was reserved and the petition and charges were annexed to it. It is our opinion that this ruling is incorrect. This was evidence tending to show, as respondent originally charged and also averred in its answer, that the

relatrix was lacking in the qualifications to perform administrative and executive work because of her inability to co-operate with others either with reference to substantial and serious matters or unimportant and inconsequential affairs.

We have carefully reviewed the record and do not find the slightest suggestion that politics provoked this trouble. There is nothing to indicate that any member of the School Board had any personal ill will, prejudice or bias against the relatrix, or was attempting to demote her for the purpose of securing the position for some friend. The members of the Board and the Parish Superintendent of Education had no personal knowledge of the causes of the trouble. The transcript unquestionably reveals that the relatrix' several controversies arose between herself and the parents and teachers because of disagreements between them over school affairs. The common complaint of the Parent Teachers' organizations of the Eighth Ward Grammar School and the Metairie Grammar School is that the relatrix has such a temperament and disposition as to make it impossible for her, as a leader, to co-operate with and to co-ordinate the efforts of others. It is singular, to say the least, that six of the seven teachers under the relatrix and several parents testified against her and only one teacher and one parent stated that they were able to get along with her "all right". One of the necessary qualifications of a principal is to be capable of successfully performing administrative and executive work. In order to have satisfactory and proper leadership, the principal must have the capacity and ability to co-ordinate the efforts of others so that they will work in accord. When constant dissension prevailed under the facts and circumstances here proven, one must conclude that there was incompetent leadership. Originally, we thought that certain unusual circumstances contributed to the unsatisfactory conditions but our attention has been called to the fact that there was more than a reasonable period of time for adjustment, but instead of the dissension and confusion abating, it became more acute and aggravated.

A teacher may be very competent and experienced in her particular line of work and, on the other hand, be lacking in the qualifications to make a competent and effective executive. The reverse may also be true that a person who is a very able administrator or executive would be a very unsatisfactory and poor instructor. Apparently, the School Board came to this conclusion because the relatrix had satisfactorily served as a teacher for some 18 years before being promoted by the School Board to a principalship, and then, after two separate assignments in different schools in that capacity, she was unable to obtain and maintain the harmony and unity required of a competent principal.

This Court, in the recent cases of State of Louisiana ex rel. Kohler's Snowite Laundry & Cleaners, Inc., v. State Board of Commerce & Industry, 205 La. 622, 17 So.2d 899; State ex rel. Bourgeois v. Board of Supervisors of Louisiana State University & Agricultural & Mechanical College et al., 205 La. 177, 17 So.2d 25,

and Cook et al. v. Caddo Parish School Board et al. (No. 37,394) wherein writs of certiorari, prohibition and mandamus were refused, refused to substitute its opinion for the judgment of an administrative Board discharging statutory duties when it acted reasonably and upon substantial evidence.

It is our opinion that the testimony and the documentary evidence in this case as well as the State Board of Education's regulations and law sustain the resolution of the School Board in transferring the relatrix from the principalship of the Metairie Grammar School to a position as a teacher with a reduction in salary and that the judgment of the district court is erroneous.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment of the district court is annulled and set aside, and plaintiff's suit is dismissed at her costs. The relatrix' right to a rehearing is reserved.

O'NIELL, C. J., dissents and assigns reasons.

ROGERS, J., dissents, adhering to his original opinion.

PONDER, J., concurs and hands down reasons.

HAMITER, J., dissents and assigns reasons.

O'NIELL, Chief Justice (dissenting on rehearing).

The argument on the rehearing of this case has not changed my opinion that the judgment of the district court should be affirmed. The only questions presented were questions of fact, as to which the judge of the district court gave a thorough analysis of the testimony. The opinion rendered originally by this court, affirming the judgment appealed from, also contained a thorough analysis of the testimony, and revealed no error in the findings of fact by the trial judge.

This case is distinguished from the case of Thoman v. State Board of Certified Public Accountants, 172 La. 261, 134 So. 85, and State ex rel. Kohler's Snowite Laundry & Cleaners v. State Board of Commerce & Industry, 205 La. 622, 17 So. 2d 899, and State ex rel. Bourgeois v. Board of Supervisors of L. S. U., 205 La. 177, 17 So.2d 25, by the fact that the present case is governed by Act 58 of 1936, known as the Teachers' Tenure Statute, which—as quoted in the prevailing opinion on rehearing in this case—provides "that it is not the intent of this act to impair the right of appeal to the court of appropriate jurisdiction." The ruling in the unreported case No. 37,394, entitled Cook et al. v. Caddo Parish School Board, refusing to mandamus the judge of the district court to grant a temporary injunction to prevent the enforcement of a resolution of the school board forbidding Greek Letter Fraternities and Sororities in the public schools, is not appropriate to this case.

PONDER, Justice (concurring on rehearing).

I do not believe that we have the right, after a hearing has been given in compliance with the law, to substitute our judgment for that of the School Board where there is no arbitrary discrimination, and the Board has not acted in a capricious manner. State ex rel. Bourgeois v. Board of Supervisors of Louisiana State University, Etc., 205 La. 177, 17 So.2d 25; State ex rel. Cotonio v. Louisiana Bar Ass'n, 111 La. 967, 36 So. 50; State ex rel. Thoman v. State Board of Certified Public Accountants, 172 La. 261, 134 So. 85; Walsh v. New Orleans Cotton Exchange, 188 La. 338, 177 So. 68. Also see: Frank Bros. v. Nat'l Labor Relations Board, 64 S.Ct. 817; International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 61 S.Ct. 83, 85 L.Ed. 50.

The mere fact that Act 58 of 1936 provides that the right of appeal is not impaired does not, in my opinion, alter the general rule.

I do not believe that it was ever the intention of the Legislature to divest the School Board of discretion in matters of this nature, provided the discretion is not exercised in an arbitrary or capricious manner.

For these reasons, I concur in the decree.

HAMITER, Justice (dissenting on rehearing).

According to the Teachers' Tenure Law, Act 58 of 1936, a school board can legally remove from office a permanent teacher only when it finds her guilty, after a hearing upon written and signed charges, of wilful neglect of duty, or of incompetency, or of dishonesty. Further, the statute declares that "it is not the intent of this Act to impair the right of appeal to the court of appropriate jurisdiction."

The evidence adduced in this controversy, in my opinion, does not support any of the three above required charges. The most that it shows is the existence of dissension between relatrix on the one hand and some of the teachers and parents on the other.

The holding of the majority opinion (on rehearing) is predicated almost entirely on a finding that the principal, Miss Rathe, committed errors in some records which she was required to compile and to keep. If this commission were unintentional, certainly it would not constitute dishonesty or wilful neglect of duty. Nor can it be correctly concluded from that alone that she is incompetent. All persons err; no one is infallible. If, on the other hand, her errors were intentional and deliberate, then she committed acts of dishonesty and should have been relieved completely of her employment with the school board instead of transferred to another school in a parish, as was done. The majority opinion, with which I cannot agree, seems to show by implication that she intentionally and deliberately erred, for it recites: "It was important that this data be accurate because she also knew that $30 of her salary per month was predicated on the correctness of that figure."

Cited and relied on in the majority opinion are the cases of State ex rel. Thoman v. State Board of Certified Public Accountants, 172 La. 261, 134 So. 85; State ex rel. Kohler's Snowite Laundry & Cleaners, Inc., v. State Board of Commerce & Industry, 205 La. 622, 17 So.2d 899; State ex rel. Bourgeois v. Board of Supervisors of Louisiana State University & Agricultural & Mechanical College et al., 205 La. 177, 17 So.2d 25; and Cook et al v. Caddo Parish School Board et al. (the last case decided by this court but not reported). Not one of these involves the Teachers' Tenure Law. True, all are authority for the well recognized rule of law that a court will not substitute its judgment for that of a public board in the exercise of executive and administrative discretion, unless the board has acted arbitrarily, discriminately, and capriciously. But that doctrine is inappropriate to a controversy concerning the removal of a permanent teacher of our public schools, in view of the provision of Act 58 of 1936 which specifically recognizes the right of appeal, as was held in Kennington et al. v. Red River Parish School Board, La.App., 200 So. 514, writ of certiorari denied by this court.

For these reasons, therefore, I respectfully dissent.

On Application for Rehearing.

PER CURIAM.

In the relatrix' petition for a rehearing, complaint is made as to the application of the law by the Court and its finding of facts in this case. It is said that the majority opinion casts aside and disregards that portion of the Teachers' Tenure Law, Act 58 of 1936, amending and re-enacting Section 48 of Act 100 of 1922, wherein it is stated " * * * it is not the intent of this act to impair the right of appeal to the court of appropriate jurisdiction." If the Legislature had attempted to make the ruling of the School Board final by placing a provision in the statute to that effect that part of the Act would be unconstitutional because the Constitution guarantees to every person claiming to have been illegally injured, the right to seek redress in the courts.

Section 6 of Article I of the Constitution (Bill of Rights) provides: "All courts shall be open, and every person for injury done him in his rights, lands, goods, person or reputation shall have adequate remedy by due process of law and justice administered without denial, partiality or unreasonable delay."

In Meyer v. Board of Trustees, etc., 199 La. 633, 6 So.2d 713, 717, the court said:

"The jurisprudence is clear that where a Board has original power to determine matters submitted to it under a statute that, after it has acted, the legal correctness of its action may be attacked in court by a party claiming an adverse legal right. State ex rel. Reynolds & Henry Construction Co. v. O'Kelly, 48 La.Ann. 28, 33, 18 So. 757; State v. Elfer, 115 La. 964, 40 So. 370."

It is, therefore, obvious that even if the above quoted provisions were not in

the statute, the party claiming an adverse legal right may resort to court for redress. For instance, in the case of Cook et al. v. Caddo Parish School Board et al., (No. 37,394 of the docket of this Court, wherein writs of certiorari, prohibition and mandamus were refused by us on the ground that the judgment was correct), there was no specific provision in the School Board Law (Act 100 of 1922, as amended) granting to the plaintiffs the right to appeal to a court of appropriate jurisdiction, yet the complainants, exercising their constitutional rights, did appeal or resort to the courts and had their case considered. There the School Board, after an informal public hearing, by vote of ten of its seventeen members, passed a resolution making students in the High School ineligible to participate in activities for extra-curricular honors and recognition if they were members of Greek letter fraternities and sororities, which had no connection whatsoever with the public schools. The reasons assigned by the Board for its action were that membership in these fraternities had a tendency to make the students undemocratic, snobbish and clannish and interfered with the proper maintenance of school interest and scholastic attainments. The members of these fraternities and their parents vigorously protested against the Board's resolution and sought relief in the courts on the ground that the School Board's action went beyond the power and authority granted to it by the statute and was an illegal and unconstitutional deprivation of the rights of these students and parents in matters outside of public school functions. The trial judge granted a rule to show cause why a preliminary injunction should not be issued against the School Board. After a hearing he refused to issue an injunction for the reasons that the School Board had acted in good faith after a hearing upon substantial evidence and that the court would not substitute its judgment for that of the administrative and executive board performing statutory duties. The judge said:

"There is nothing more firmly established in law than the principle that, within the limits of their authority, the power and discretion of legally created governing boards is supreme. Their wisdom or good judgment cannot be questioned by the courts. Members of these boards are appointed or elected because of their peculiar fitness for the post. Judges are elected because of their legal knowledge and ability. They are not experienced in the business affairs of Parishes and municipalities, * * * or the conduct of a public school system. A presumption of legality and regularity attaches to the action of all government boards. It is only when it is clearly shown that the action of such a board is beyond its authority or is arbitrary, unreasonable, or fraudulent that a court is justified in interfering."

In short, the court concluded that there was no invasion or deprivation of any legal right of the complainants and that the Board had acted within the scope of its power.

In the case of State ex rel. Bourgeois v. Board of Supervisors of Louisiana State University & Agricultural & Mechanical College et al., 205 La. 177, 17 So. 2d 25, 29, the Board created and entrusted with certain powers and duties by the statute discharged a professor (a married man and the father of nine children) who took a coed in his car for a ride in the afternoon and parked it along the public highway, in plain view, where the young lady, a friend of the professor's wife, rested her head in his lap. He instituted mandamus proceedings to be reinstated. It was also contended, in the alternative, that removal was too severe and harsh and that suspension would have been adequate. The trial judge refused to interfere as the Board had acted upon substantial evidence, although no wrongdoing was shown. He refused to substitute his judgment for the Board's and dismissed the suit because the statutory created Board entrusted with certain administrative and executive functions had acted in good faith for what it considered was the best interest of the university. The relator appealed to this Court. In upholding the correctness of the judgment of the district court, we said:

"The trial court arrived at the conclusion that the acts of the relator were of sufficient gravity to warrant his discharge as shown by its written reasons. It is unnecessary for the purpose of this decision for us to go into a detailed analysis of the facts. The relator was given the hearing provided for in the tenure regulations and discharged.

"The faculty committee, after a hearing, arrived at the conclusion that the acts of the relator were of sufficient gravity that he should be discharged. The president, acting upon the recommendations of this committee, discharged the relator, and his action was ratified by the board of supervisors.

"We have no right to substitute our judgment for that of the authorities of the University, especially since there is no contention that the authorities of the University discriminated arbitrarily against the relator or acted in a capricious manner. Whether the University's judgment was exercised wisely or unwisely is not for us to decide. State ex rel. Cotonio v. Louisiana Bar Association, 111 La. 967, 36 So. 50; State ex rel. Thoman v. State Board of Certified Public Accountants, 172 La. 261, 262, 134 So. 85; Walsh v. New Orleans Cotton Exchange, 188 La. 338, 177 So. 68; also see, Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95."

It will be noted that the first cited case deals expressly with the public school system of education and Act 100 of 1922, as amended, under which the State Board of Education and the Parish School Boards function. It will be further observed that the second case also involved the operation of a State College, which is a part of the public school system of education of Louisiana. It is indisputable that the jurisprudence of this State is settled beyond doubt that where a statute creates a Board and grants to it certain administrative and executive functions and

responsibilities, the courts will not interfere with the bona fide judgment of the Board based upon substantial evidence. It is only where the complainant shows there has been an invasion of his rights by the Board exceeding its powers or doing him an injustice that the courts have set aside the actions of the Board. This judicial pronouncement is either sound or unsound. No one in this case has challenged the correctness of the decisions to that effect. The complaint is that they are inapplicable here. This statement is inconsistent with the rulings of this Court in the two above cited cases where the doctrine was applied. It is immaterial whether the case comes to this Court by appeal or writs under its supervisory jurisdiction because the litigant is entitled under the Constitution to have his asserted rights determined. The correctness of this statement is borne out by the fact that the Cook case, supra, was brought here and considered by us under our supervisory power and the Bourgeois case, supra, and the present one came here on appeal and in each instance the rights of the parties presented were determined by the same rule of law.

It cannot be seriously stated that this Court has cast aside and disregarded the portion of the Teachers' Tenure law which gives the complaining teacher the right to appeal to the court from the action of the Board. In the instant case, the relatrix did appeal to the court from the adverse ruling of the Board and while the district judge was of the opinion there was not "a scintilla of evidence" to uphold the

Board's resolution, the majority members of this Court found otherwise.

The relatrix admits that Miss Tracey, the Third Grade teacher, assisted her in making up the principal's monthly reports and the principal's session report required by the statute and the regulations of the State Board of Education to be filed with the School Board. Miss Tracey testified that she was instructed by the relatrix to cut down the absences and that although she informed the relatrix that the reports were erroneous and called her attention to discrepancies, the relatrix persisted in having the reports made out as she directed. Miss Walker, the Kindergarten teacher, testified that she was also instructed by the principal to cut down on the absences.

The six teachers who testified against the principal and the one who testified in her behalf all stated that they properly kept the daily school register of absences and attendances of the children in their respective classes and at the end of the month accurately reported the total days of attendances and absences of all of the children in their classes. None of these teachers had any interest in misrepresenting their respective reports to the principal. The daily school register of each teacher including the relatrix, who taught the Sixth Grade, and the principal's nine monthly reports and the principal's session report, all made at a time unsuspicious, corroborated Misses Tracey's and Walker's testimony that they were instructed by the principal to cut down absences. The principal's monthly reports and the principal's session report on absences is identical. A tabula-

tion and comparison of the principal's nine monthly reports and the session report (September 9, 1940, through June 4, 1941), with the teachers' daily register of absences, is as follows:

| Grade: | Principal's 9 monthly reports and session Report: | Teachers' Register: | | Difference: |
|---|---|---|---|---|
| Kindergarten | 342 | 342 | (These figures accepted as accurate although daily register was not kept by Kindergarten teacher, on principal's instructions.) | — |
| First | 298 | 620 | | 322 |
| Second | 70 | 78 | | 8 |
| Third | 170 | 376 | | 206 |
| Fourth | 439 | 568 | | 129 |
| Fifth | 214 | 286½ | | 72½ |
| Sixth | 115 | 307 | | 192 |
| Seventh | 308 | 357 | | 49 |
| Totals | 1956 | 2934½ | | 978½ |

The principal's nine monthly reports show:

| Dates of reports: | Total absences for month: |
|---|---|
| Oct. 1940 | 53 |
| Nov. 1940 | 75 |
| Dec. 1940 | 151 |
| Jan. 1941 | 408 |
| Feb. 1941 | 328 |
| Mar. 1941 | 321 |
| Apr. 1941 | 227 |
| May 1941 | 203 |
| June 1941 | 190 |
| Total absences for session September 9, 1940 through June 4, 1941...... | 1956 |

The relatrix in her testimony sought to explain these errors on the ground that Miss Tracey became hostile to and angry with her and, therefore, made misstatements in the reports. She admits that during the first two months of the school session there was understanding between the teachers and herself and they co-operated with her and it was only thereafter that all of the teachers except one became unfriendly towards her. The record clearly shows that the principal's nine monthly reports and the principal's session report were each erroneous in reporting the absences. As the relatrix admits that she was on friendly terms with Misses Tracey and Walker during the first two months of the school session there certainly could not be any reason why those two principal's monthly reports were incorrect except the explanation of those two witnesses that they were instructed to cut down absences.

The only countervailing proof offered by the relatrix was her own testimony deny-

ing that she had given any instructions to these two teachers to cut down the absences. Clearly, the testimony of Misses Tracey and Walker that they were instructed by the principal to cut down absences is conclusively supported by the daily school register of each of the teachers including the relatrix and her nine principal's monthly reports and her principal's session report. The charge of wilful neglect of duty to keep the proper records required by the State Board of Education's regulations and the provisions of Act 100 of 1922 were not only proven by an overwhelming preponderance of the evidence but were established beyond doubt.

We recognize that "Fits of inadvertence seize the most vigilant" and "To err is human" and that allowances should be made for fallibilities. However, where there is a systematic reduction of the absences shown on the daily school register by reporting a great many less—that is, 978½—on the nine consecutive monthly reports and the session report, it must be concluded that this is not an oversight and inadvertence but the result of wilful neglect to keep proper and accurate records.

There are other errors in the principal's session report and the principal's monthly report. For instance, although Miss Walker, the Kindergarten teacher, was instructed by the principal not to keep records of the daily attendances and absences of the children in her class, nevertheless, the principal's session report shows "aggregate days of attendance" 3357 and the principal's nine monthly reports show "aggregate days of attendance" 3030, or a difference of 327.

The principal in her daily register of the Sixth Grade class shows 16 promoted, 6 conditioned, and 2 failed. In her principal's session report to the Board, she shows 16 promoted, 9 conditioned, and 4 failed. In her daily register, she shows Florence Haydel as having been dropped on account of illness but promoted on condition, yet this girl is reported to be absent only one day out of 180 school days of the full school term and never tardy.

We could cite additional similar errors —all tending to show either wilful neglect of duty or incompetency to keep proper and accurate records.

It must be remembered that at the time the daily school register of the Sixth Grade was made by the relatrix in her own handwriting and her nine monthly principal's reports and the principal's session report were made, she was in complete charge and custody of all of these records, and she admits that she was instructed that it was her duty as principal to make the reports.

The charges of incompetency as principal to secure and maintain harmonious and efficient co-ordinated efforts of parents and teachers were also established by the great preponderance of the evidence. Even the parent and teacher who testified in behalf of the relatrix and she herself admitted that there was contention, dissension, and strife between the parents and teachers and the principal.

Act 58 of 1936, which amends Section 48 of Act 100 of 1922, does not in any way indicate that it was the intention of the Legislature to subordinate the School Board to the teachers. It expressly grants the Board the right to remove or discharge a teacher for statutory cause and places the members of the School Board in a quasi judicial position to hear and determine the correctness or incorrectness of the charges made against teachers. When the Board was confronted with the general chaotic condition in the school due solely and only to differences between the principal and the parents and teachers and it was shown that the principal's reports were uniformly incorrect in reporting absences, the Board was compelled to act in discharging its statutory duty and responsibility to the pupils of the school and the public school system of the Parish.

It is easy to visualize what would happen if the principal were retained under the facts and circumstances of the case. No one could reasonably expect this school to be properly operated. The evidence shows that the school subsequently functioned efficiently with a new principal and there was not any dissension. The School Board, in good faith, upon serious, substantial and convincing evidence, which overwhelmingly preponderates in proof of the charges, legally exercised its judgment for what it considered the best interest of the school system in demoting the relatrix from the position of principal to that of a teacher in the High School with retention of her tenure rights. If the Board erred and acted illegally or unrea-

sonably or without sufficient evidence, it was the duty of the trial judge to correct the error. But, where, as here, the evidence leaves no doubt as to wilful neglect of duty and incompetency of the relatrix to serve as principal, the learned district judge had no right to set aside the resolution of the Board.

It is said that the Board should have discharged the relatrix and not merely demoted her as the principal, if the evidence is sufficient to sustain the charges. The whole attitude of the School Board, as reflected by the record shows indulgence of the relatrix, first, in promoting her to the principalship of the Eighth Ward Grammar School, second, in transferring her to a new school as principal after she had gotten into difficulties as principal in the Eighth Ward Grammar School, and third, in only demoting her as principal but with retention of Tenure rights as a teacher in the High School. The mere fact that the Board showed sympathy and indulgence to the relatrix because of her long tenure of service is no good reason for saying that the action of the Board should be rescinded because it was less severe than it might have been.

The relatrix' attitude towards the Parent-Teachers' organization is expressed by her counsel:

"Q. Yet, on the other hand, you say that Miss Rathe did co-operate with you? A. In her moments of weakness.

"Q. I think that is a slam against Miss Rathe, which I don't think belongs in the record. A. I can't see where its a 'slam'.

"Q. Well, 'cooperation in moments of weakness' certainly sounds like a slam to me. Maybe that's where she made a mistake—in co-operating with the Parent-Teachers. My experience as a teacher and as a principal has taught me that the more you have to do with Parent-Teachers organizations the less you get done; and the less you have to do with them, the better off you are."

The relatrix' feeling towards the parents and teachers of her school was revealed when she stated that the teachers were against her because they wanted to stand around enjoying themselves rather than carry out their duties; that the parents were opposed to her because she would not let them spend the funds of the Parent-Teachers' organization for their own pleasure; and that the new principal of the school, who succeeded her, had broken open the principal's desk and taken the relatrix' papers.

The record indisputably shows that the trouble was exclusively between the parents and teachers of the students of the school and the principal, and neither the members of the School Board nor the Superintendent of Education had any personal knowledge of the difficulties or were in any way involved therein.

The evidence reveals the utter futility of the Board attempting to operate this school under the facts and circumstances proved in this case with the relatrix as the principal thereof. We have carefully reconsidered the case and it is our opinion that the judgment of the trial court holding that there was not "a scintilla of evidence

to prove the charges" against the relatrix as principal is manifestly erroneous.

For the reasons hereinabove given and for those stated in our opinion on rehearing dated May 22, 1944, the relatrix' application for a rehearing is denied at her costs.

O'NIELL, C. J., and ROGERS and HAMITER, JJ., adhere to their original opinion.

### On Motion to Vacate Judgment and to Recuse.

ODOM, Justice.

The appeal in this case was lodged in this court on September 25, 1942. On December 13, 1943, we handed down an opinion affirming the judgment of the lower court. Subsequently a rehearing was granted, and on May 22, 1944, we handed down an opinion on rehearing setting aside our original opinion and reversing the judgment of the district court. We ordered relatrix's suit dismissed at her costs, but granted her the right to apply for a rehearing.

On June 5, 1944, relatrix filed in this court a motion "to vacate and recall the opinion and decree rendered in this cause on Monday, May 22, 1944, for the reason that the same was improvidently rendered and handed down, because said judgment was rendered and concurred in by only four members of the court, one of whom, Mr. Justice HIGGINS, was disqualified from taking part herein because of (1) His being interested in the Cause, (2)

His being related to one of the parties within the fourth degree."

It is further alleged in the motion that, Justice HIGGINS being without right to participate in the decision, "it remains that three justices of this court qualified to sit concurred in the decree but that three justices of this court dissented and therefore no decree could constitutionally and legally have been entered."

Relatrix prayed "that the said opinion and decree be vacated and recalled and that mover be granted a rehearing and that the case be further argued before a court legally constituted by the calling in of a Judge from another court as provided for by the Constitution of Louisiana."

As shown on its face, the motion was made for the dual purpose (1) of having the decree rendered on rehearing vacated and recalled on the ground that only four justices concurred in the opinion, one of whom, Justice HIGGINS, was not qualified to take part in the case, and that therefore the opinion was rendered by only three qualified judges, which is not a majority of the court, and (2) of having Justice HIGGINS recused and a judge from another court called in to act in his stead.

It is alleged that Justice HIGGINS should be recused for two reasons: (1) That he is interested in the cause, and (2) that he is related to one of the parties within the fourth degree.

Even if it be conceded that there is merit in the motion to recuse Justice HIGGINS, the motion to recuse comes too late and cannot be considered. The

case was originally argued and submitted on November 9, 1943. Justice HIGGINS was then on the bench and took part, to the knowledge of counsel for relatrix. A rehearing was granted on February 10, 1944, and the case was argued and submitted on rehearing on April 24, 1944, and Justice HIGGINS wrote the opinion on rehearing. The motion to recuse was filed in this court on June 5, 1944, 14 days after the opinion on rehearing was handed down.

Relatrix and her counsel reside in the Parish of Jefferson, where this suit originated. They knew, of course, when the case was first submitted to this court, that Justice HIGGINS resided in that parish also, and they knew, of course, that Justice HIGGINS is a brother of Lemuel Higgins, superintendent of schools of that parish. They have known all this from the time the appeal in the case was lodged in this court. And yet, without making the slightest objection to Justice HIGGINS' taking part in the case, counsel argued and submitted the case to the court on two separate occasions. If he had thought that Justice HIGGINS was not qualified to take part in the case because of his alleged interest therein and because he is related within the fourth degree to Lemuel Higgins, the parish superintendent of schools, it was his duty to speak before the case was first called for hearing in this court. It is perfectly apparent that he was willing for Justice HIGGINS to take part in the case; otherwise he would have moved to recuse him before the case was heard.

According to Article 337 of the Code of Practice,

"Recusation is the refusal, on the part of the defendant, to have his cause tried by the judge before whom he has been sued, on account of the ties of relationship existing between such judge and the plaintiff, or for other just causes hereinafter expressed."

Relatrix did not refuse to have her cause tried before Justice HIGGINS. She permitted it to be tried before the court with Justice HIGGINS as one of its members. She now complains that the judgment is invalid because Justice HIGGINS was one of the four who took part in the opinion on rehearing. She cannot be heard to complain now.

In the case of State v. Bordelon, 141 La. 611, 75 So. 429, 430, this court held that a judge may be recused before trial or, just as soon as the defendant becomes aware of the cause for recusation, during the course of the trial, but that he cannot be recused after trial and judgment.

After quoting Article 337 of the Code of Practice, we said in the course of our opinion:

"Thus it seems, from the article quoted, that a defendant may recuse the judge during the trial of a cause; and that is so of other statutes relating to recusation. There is no provision found for the recusation of a judge *after the trial of the case, or on appeal.*" (Italics are the writer's.)

It was definitely held in that case that, where a defendant is acquainted with all the facts and permits the case to go to trial and judgment is rendered, he cannot thereafter have the judge recused, and that it was the defendant's duty to file a motion to recuse immediately after the facts were known to him, and his failure to file the motion in time was a waiver of his rights under the statute.

In the Bordelon case the court quoted extensively from the case of Ricks v. Gantt, 35 La.Ann. 920, which was a civil case. In the Ricks case the court said:

"It thus appears that, at the inception of the suit, the defendant was fully aware of the relations of the JUDGE to the cause, upon which his present charge of incompentency is based. Nevertheless, without objection, he joined issue and, in fact, expressly asked the Judge to pass upon the very question as to whether the payment made to him 'was properly or improperly made, and whether the defendant should or should not be allowed a credit for it,' which question is the sole ground of personal interest in his subsequent pleadings as cause for recusation."

It was held in the Ricks case that, under the circumstances, the motion to recuse came too late.

Furthermore, we find no merit whatever in the suggestion that Justice HIGGINS should be recused. Counsel for relatrix suggest no reason whatever why Justice HIGGINS should have any personal interest in the outcome of this litigation. He is a resident of the Parish of Jefferson and a taxpayer there. But that affords no reason for recusing him. He is a brother of Lemuel Higgins, superin-

tendent of schools of Jefferson Parish, but Lemuel Higgins is not a party to this suit. Relatrix brought her suit against the Jefferson Parish School Board. Lemuel Higgins is not a member of the board. It is true that he is secretary of that body, but he did not originate the charges made against relatrix. The charges were made by "parents of pupils attending the Metairie Grammar School." They petitioned the Jefferson Parish School Board "that a new principal be appointed for the School for the coming year, because of a decided lack of efficiency in the conduct of the school." Miss Rathe, the relatrix, was principal of the Metairie Grammar School at the time. This petition seems to have been presented to Superintendent Higgins, and, according to the minutes of the school board, he presented the petition to the board, which it was his duty to do under the law. There is nothing in the record to indicate, much less to show, that Superintendent Higgins caused this petition to be drawn up and presented to the board. The school board subsequently ordered Superintendent Higgins to make an investigation of the charges brought against relatrix, and, so far as the record discloses, the investigation which he made was fair and impartial. The action of the school board was not based on his report but on the testimony of witnesses who appeared before the board at an open hearing, at which relatrix was invited to appear.

Superintendent Higgins testified as a witness in the case and said that he had no personal knowledge of the merits of the charges made against relatrix other than what the witnesses said.

According to Article 338 of the Code of Practice, one of the causes for the recusation of a judge is "His being related to one of the parties within the fourth degree." Justice HIGGINS is related within the fourth degree to Lemuel Higgins, superintendent of schools of Jefferson Parish, but Lemuel Higgins is not "one of the parties" to this litigation.

The motion to vacate and to recuse is denied.

HIGGINS, J., takes no part.