*319
 
 HIGGINS, Justice.
 

 This is an action by a widow against the Board of Trustees of the Firemen’s Pension and Relief Fund for the City of New Orleans, in which she is seeking a pension in the sum of $15 per month from November 28, 1936, to the date of her death or until she remarries. This suit is based upon Section 12 of Act 43 of 1902, as amended by Act 27 of 1914, which reads, as follows:
 

 “Section 12. Be it further enacted, etc.,
 
 that if any member of said fire department shall, while responding to an alarm of fire or while working at or returning from a fire, be killed or receive injuries which shall result in the death of the injured fireman within six months from the time said injuries are sustained, and shall leave a widow,
 
 or child or children under the age of fourteen years,
 
 surviving, said Board of Trustees shall direct the payment from said pension and relief ftmd to such widow, while unmarried, of fifteen dollars monthly,
 
 and for each child, until it reaches the age of fourteen, six dollars monthly; should he leave no widow or children, but a widowed mother dependent upon him for support, the said board shall pay her the sum of fifteen dollars monthly, as long as she remains unmarried; provided, the combined pension shall not exceed one-half the monthly salary of the deceased member at the time of his death; and further, that the said pension shall not operate as a bar to the payment of any death benefits. otherwise provided in this act.” (Italics ours.)
 

 The petitioner alleges that she was married to John Lacey, the deceased, on October 20, 1920, and that there was no issue of the union; that her husband was-employed by the Fire Department of the City of New Orleans as a chauffeur on Pumper No. 5 and was stationed at 821 Magazine Street; that about 8 o’clock on the night of November 27, 1936, an alarm was sounded in the neighborhood of Annunciation and Calliope Streets; that her husband, in the performance of his duty drove the fire engine or Pumper No. 5 to the place from where the alarm was given; that it was necessary for him to drive upon some very rough streets, particularly Annunciation Street, which was roughly surfaced with cobble stones; that due to the roughness of the streets, he was subjected to severe shock and strain and was thrown about on the seat of the fire engine and his head was brought in violent contact with a part of the engine or the apparatus, thereon or the fixtures thereof, causing a concussion of the brain or fracture of his skull from which a hemorrhage resulted; that upon returning to the fire station, he complained of feeling ill and stated that during the ride he had “felt something snap in his neck and a sudden pain in his. head”; that he remained on duty at the fire station that night suffering from a severe headache, nausea and vomiting spells, which continued during the following day (November 28) while at his home;, that on the evening of November 28, he reported for duty at the station and while sitting on a chair, about 6:45 p. m., he slumped over in an unconscious condition; and that he was immediately taken to the Charity Hospital, where he was pronounced
 
 *320
 
 dead, the cause of his death being diagnosed as “cerebral hemorrhage”. The petitioner also alleged that she made amicable demand on the Board for the pension, which was refused.
 

 The defendant, in its answer, admitted the employment of the deceased as a fireman; that he had responded to the fire alarm; that he died on the date in question; and that it had refused the widow’s claim for the pension. The defendant denied that the deceased had received any injuries while engaged in his duties as a fireman and averred that his death resulted from “natural causes”. It also pleaded that its decision on the plaintiff’s application was final and conclusive under the provisions of Section 3 of Act 43 of 1902, as amended by Act 27 of 1914, and not subject to review by the Court. This section reads, as follows:
 

 “Be it further enacted, etc., that the said Board shall have exclusive control and management of the fund mentioned in the first section of this act, and of all money donated, paid or assessed for the relief or pensioning of disabled superannuated and retired members of the fire department, their widows and minor children, or widowed mothers, and for the payment of death benefits, and shall assess each member of the fire force not less than one per cent., nor more than two per cent., of the salary of such members, to be deducted and withheld from the monthly pay of each member so assessed, the same to be placed by the treasurer of said fund to the credit of such fund, subject to the orders of such board.
 
 The said board shall make all needful rules and regulation for its government in the discharge of its duties, and shall hear and decide all applications for relief, pensions and death benefits under this act, and its decisions on such applications shall be final and conclusive, and [not] subject to review or reversal except by the board.
 
 The board shall cause to be kept a record of all its meetings and proceedings.” (Italics and brackets ours.) ■
 

 When the case was called for trial on its merits, the defendant’s counsel objected to the plaintiff offering any testimony or evidence on the ground that the petition did not disclose any right or cause of action, which exceptions and objection were predicated upon Section 3 of the statute already specially pleaded. Counsel for the plaintiff then stated to the court that if the construction placed upon Section 3 of the statute by the defendant that the court had no jurisdiction of the case were accepted, it would make that part of the statute unconstitutional for four reasons : First, there would be an encroachment upon the powers of the judiciary; second, there would be a denial of'equal protection of the law; third, there would be a delegation of legislative power and discretion without proper safeguards; and fourth, there would be a denial of due process of law.
 

 Upon the conclusion of the trial, the judge overruled the special plea, the exceptions and the objection to the'evidence on the ground that to construe Section 3 of the act as the defendant sought to do would be giving the Board the exclusive authority and power to finally decide pen
 
 *321
 
 sion claims thereunder on both questions of law and fact and thereby deprive the court of its jurisdiction vested in it by the Constitution and, thus, make that section of the statute unconstitutional. On the merits of the case, he concluded that the evidence showed that the deceased while responding to a fire alarm received injuries which resulted in his death the next evening and that his widow was, therefore, entitled, under Section 12 of the Act, to receive the pension as prayed for, and judgment was accordingly entered.
 

 The defendant appealed.
 

 If the construction placed by the defendant on the pertinent language of Section 3 of the statute, that the decisions of the Board on the applications for pensions shall be final and conclusive and not subject to review by the courts on questions of law and fact, is accepted, this would undoubtedly make that part of the law unconstitutional.
 

 Under the provisions of Section 12 of the statute, the plaintiff, as the widow of the deceased, was entitled to receive a pension, provided her husband’s death resulted from injuries received while answering a fire alarm. Her statutory right to a pension became vested upon the happening of his death and the fulfillment of these other requirements. If the construction placed upon Section 3 of the Act by the defendant that the Board has the exclusive power and authority to decide claims for pensions, without the claimant having the right to have its decision reviewed by the courts, is adopted as correct, it is easy to see that the Board, at will and upon purely arbitrary grounds, could deprive the claimant of her vested statutory rights. This result, for all practical purposes would be equivalent to the Legislature delegating to the Board the right to amend the provisions of Section 12 of the statute which fixes the rights of the claimant. The decision of the Board neither creates the widow’s rights nor vests them in her. The law and the happening of certain events vest in her the right to the pension.
 

 Under the terms of the statute, a certain percentage of the plaintiff’s deceased husband’s salary as a fireman was placed in the pension fund and, therefore, the statute in the instant case cannot be considered as granting a gratuity to the widow. When the plaintiff’s husband died, under the facts set forth in her petition, she had a vested right, under Section 12 of the statute, or a right and cause of action, which the court had jurisdiction to entertain. Pennie v. Reis, 132 U.S. 464, 10 S.Ct. 149, 33 L.Ed. 426; Dodge v. Board, etc., of Chicago, 302 U.S. 74, 58 S.Ct. 98, 82 L.Ed. 57; State ex rel. McKay et al. v. Board of Trustees of Firemen’s Pension and Relief Fund, 141 La. 427, 75 So. 103; 43 C.J.Mun.Corp.Sec. 1421, p. 817; Hayes v. City of Hoboken, 93 N.J.L. 432, 108 A. 868, and Clarke v. Earle, 42 N.J. L. 94-97.
 

 Section 6 of Article 1 of the Constitution (Bill of Rights) provides:
 
 "All courts shall be open, and every person for injury done him in his rights,
 
 lands, goods, person or reputation
 
 shall have adequate remedy by due process of law and justice ad
 
 
 *322
 

 ministered without denial,
 
 partiality or unreasonable delay." (Italics ours.)
 

 Article VII of the Constitution of Louisiana of 1921 vests, in the Supreme Court, the Courts of Appeal and the district courts judicial power.' Sections 80 and 81, respectively, .of the same Article, create the Civil District Court for the Parish of Orleans and vest it with original civil jurisdiction. Therefore, the pertinent provision in Section 3 of the above statute cannot be interpreted as the defendant demands that it should be, without resulting in its nullity or unconstitutionality.
 

 It would be most unusual, if not extraordinary, to hold that the Legislature intended that the Board, which is given the full power and authority to administer the pension fund, is the sole and only judge of the legal rights of the widow under the provisions of the statute and that its decisions would
 
 not
 
 be subject to review by the courts. The .Board under these circumstances would be the final judge of its own case in which it was involved as a party.
 

 It will be observed that thé legislators, in Section 3 of the statute; did
 
 not state
 
 expressly that the applicant would not have any right to resort to judicial process, or that the courts would not have any authority or jurisdiction to consider the applicant’s claim or review the decision of the Board. The defendant seeks to arrive at the .conclusion that the court is without jurisdiction by interpretation or implication.
 

 The language in Section 3 of the act that the decision of the Board shall be final and conclusive and not subject to review or reversal, except by the Board, might well have been placed in the statute to prevent the claimant for the pension, from contending that some authority other than the courts would have the right to review or modify the Board’s decision.
 

 Another possible construction of the language in question is that, as between the Board and the claimant for the pension, the decision of the Board is final and conclusive and not subject to further review or reversal except by .the Board on its own motion, so as to prevent the Board of Trustees of the Pension Fund from being annoyed or harassed with repeated applications for the same pension after the Board had decided adversely to the claim therefor. Viewed in this way, the part of the statute in controversy would not fall because it would not encroach upon the jurisdiction of the courts conferred upon and vested in them by the Constitution. In short, if the decision of the Board is final as to any right that the claimant may have before it, but not final as to any right which the Constitution gives the claimant to resort to court, and the right the Constitution grants to the Court to entertain jurisdiction thereof, then that part of the statute would be valid and constitutional. As the language in question is susceptible of a construction other than that given it by the defendant, in order to avoid declaring that part of the statute unconstitutional, we shall not construe it as an attempt
 
 *323
 
 by the Legislature to deprive the claimant of her right to resort to court, and the court, of its jurisdiction to hear and determine the case. State ex rel. Tulane Homestead Association v. Montgomery, 185 La. 777, 171 So. 28; 16 C.J.S., Constitutional Law, § 98, p. 234 et seq.
 

 The jurisprudence is clear that where a Board has original power to determine matters submitted to it under a statute that, after it has acted, the legal correctness of its action may be attacked in court by a party claiming an adverse legal right. State ex rel. Reynolds & Henry Construction Co. v. O’Kelly, 48 La.Ann. 28, 33, 18 So. 757; State v. Elfer, 115 La. 964, 40 So. 370.
 

 In the case of State ex rel. McKay et al. v. Board of Trustees of Firemen’s Pension and Relief Fund, 141 La. 427, 75 So. 103, the defendant appealed from a judgment of the district court making peremptory a writ of mandamus ordering it to place the relators on the Firemen’s Pension roll, under Act 43 of 1902, as amended by Act 17 of 1904 and Act 153 of 1914. The defendant pleaded that under Section 3 of the statute its decision was final and conclusive. Nevertheless, the court accepted jurisdiction of the case and reviewed and affirmed the decision of the district court and granted the widows the pensions that the Board had denied them. In that case, it will be observed that the court accepted jurisdiction and acted in the matter, although the unconstitutionality of Section 3 of the statute was not pleaded.
 

 Counsel for the defendant relies upon the case of State ex rel. Lynch v. Board of Trustees of Fireman’s Pension & Relief Fund, 117 La. 1071, 42 So. 506, 510, 8 Ann. Cas. 945. In that suit, the widow petitioned the Court for a writ of mandamus to compel -the Board to grant her a pension under the statute, before the sum of $20,000 had accumulated in the pension fund. The defendant pleaded, under Section 3 of the statute, that its decision was final and that the court had no right to review its holding, and that under the statute it could not legally pay any claims for pension until the amount of $20,000 was deposited in the pension fund. The district judge granted the alternative writ and this Court affirmed that judgment. A rehearing was granted and a divided Court vacated and annulled its former decree and dismissed the plaintiff’s suit on the ground that the Board had discretionary power under the statute and a writ of mandamus could not legally issue to compel the Board to perform a duty which was not ministerial. The Court also, in reviewing the case, concluded that the construction placed upon the act by the Board was correct in that it had no authority to pay a claim for pension until $20,000 was deposited in the pension fund.
 

 The foregoing authority does not support defendant’s position for three reasons: First, the court accepted jurisdiction and 'reviewed the case, although the Board claimed that it had finally passed upon the claim. Second, the constitutional questions involved here were not raised there, as shown by the following language from the opinion: “The act itself thus disposes of this mandamus proceeding, unless its pro
 
 *324
 
 visions be held unconstitutional, and they have not been assailed on that ground.” Third, the issue involved was the right of the claimant to a writ of mandamus.
 

 The recent cases of H. A. Gray, as Director of Bituminous Coal Division of Department of Interior, et al. v. Legh R. Powell, Jr., and Henry W. Anderson, as Receivers of Seaboard Air Line Railway Company, 62 S.Ct. 326, 86 L.Ed. —, and the Pittsburgh Plate Glass Co. v. National Labor Relations Board, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251, decided by the United States Supreme Court, are not applicable here because in those cases the contention that the Court was without any jurisdiction to consider and review the decisions of the Administrative Director or the Board, respectively, was not before the Court. As a matter of fact the Court did consider the decisions of the Director and the Board, respectively, and affirmed them by a divided Court. It further appeared that the delegation of legislative power by Congress to these administrative agencies was not arbitrary and unconstitutional and that the guides for administrative action were adequately, definitely, and elaborately stated in the statutes.
 

 Counsel for the defendant argues that the district court and this Court have no right to consider the question of the constitutionality of the pertinent part of Section 3 of the statute, because the plaintiff did not specially plead it.
 

 In the instant case, the special plea, the exceptions of no right and no cause of action, and the objection to the evidence all being founded on the defendant’s interpretation of Section 3 of the statute, that the Board’s decision was'final and not subject to judicial review, the jurisdiction of the district court to hear and determine the case was necessarily involved. In short, the proper interpretation of Section 3 was placed squarely before the court by the defendant. The Legislature is powerless to deprive the courts of their constitutionally conferred jurisdiction. When the defendant’s attorney in his argument before the district court • made clear his position that under his interpretation of the statute, the court had no jurisdiction to entertain the case the plaintiff’s attorney promptly met this construction by pointing out that to give Section 3 of the statute the effect which the defendant sought would render it unconstitutional. Therefore, the issue of the proper construction of Section 3 of the act was raised by the defendant and was met by the plaintiff, and the trial judge had the right to pass upon it.
 

 In the case of State v. Daly J. Doucet, 199 La. 276, 5 So.2d 894, the respondent attacked the authority of this Court to issue writs under its supervisory powers in a matter involving the recusation of a district judge, until after the accused had been sentenced. We answered this contention by stating:
 

 “It is clear that this Court has plenary power under Sections 2 and 10 of Article VII of the Constitution of 1921, granting it supervisory jurisdiction over all inferior courts and that these constitutional provisions must prevail over any provisions in a legislative act that conflict therewith. It
 
 *325
 
 is, therefore, apparent that this Court had the constitutional power and authority to' issue the writs and, therefore, they were not improvidently granted”, citing State v. Burris, 169 La. 520-536, 125 So. 580.
 

 In the case of Ryals v. Todd et al., 165 La. 952, 116 So. 395, 396, the plaintiff instituted a suit against the defendant to annul and set aside a tax deed and to have it erased from the conveyance records. There was judgment in favor of the plaintiff in the district court and the Court of Appeal affirmed it. In applying to the Supreme Court for a writ of review, the relator complained that the Court of Appeal had erred in deciding the case on a point which was not suggested by the pleadings or raised in the argument in the lower court and for the first time raised by the plaintiff’s counsel in his brief in the appellate court, the brief not having been submitted to opposing counsel at the time required by the rules of the court. In answering this contention adversely, this Court said:
 

 “With reference to the first and second alleged errors, it may be said that, as defendants, in their answer, allege the validity of their tax title and prayed to be decreed the owners of the land in controversy by virtue of that title, replication to this affirmative averment was not necessary, as defendants had thus opened the door to every objection of law or fact that the plaintiffs might have urged against the validity of their title without further pleading. C.P. art. 329; McMaster v. Stewart, 11 La.Ann. 546; Hickman v. Dawson, 33 La.Ann. [438], 442; Telle v. Fish, 34 La. Ann. [1243], 1244; Webre v. Christ, 130 La. 450, 58 So. 145; Abshire v. Lege, 133 La. 254, 62 So. 667. We do not consider the cases of Sintes v. Commerford, 112 La. 706, 36 So. 656, and Prince v. Standard Oil Co., 147 La. [283], 285, 84 So. 657, which are cited by relator, as applicable to the facts of this case, for the reason that the answer of these defendants put the question of the validity of their title at issue.”
 

 We conclude that the trial judge had the' right and jurisdiction to consider the contentions made by the defendant and the plaintiff, respectively, as to the proper interpretation of the part of Section 3 of the act in question and that he correctly maintained the plaintiff’s construction thereof, giving it constitutional effect.
 

 The record shows that the deceased was fifty years of age, that he was six feet, two inches tall and weighed about 205 pounds; that he was very active, possessed a jovial spirit, and enjoyed a happy home life; that he smoked moderately and never used alcoholic liquor; that he had been employed by the Fire Department of the City of New Orleans for seventeen years and during that entire period his health was excellent and he worked' regularly; that he was not afflicted in any way and never complained of feeling badly or dizzy; that on November 27, 1936, he reported for work about 5:30 p.m., in his usual fine spirits and to all appearances in good physical condition; that at 8 o’clock that night a fire- alarm was received at the station and he, as the chauffeur on Pumper No. 5 (a nine year old 13,000 pound fire engine, with 95 pound pressure pneumatic tires, which could be handled only by a strong, healthy and able-
 
 *326
 
 bodied man), and a crew of five other firemen answered the alarm; that in taking the most direct route to the place from where the alarm had been reported, it was necessary to travel about two' blocks on Annunciation Street, over cobble stones and through large holes and ruts; that the ride over this stretch was exceedingly rough; that upon reaching their destination, the deceased complained of having been badly shaken up by the ride; that the alarm proved to be a false one and the deceased drove the engine back to the station; that upon arrival at the station, he was unable to immediately descend from the driver’s seat and remained there in apparent pain; that upon inquiry by his fellow-workers, he complained that he was ill and that his head had almost been jerked off during the ride and that he had felt something snap in his neck and a sudden pain in his head; that he took some aspirin tablets and then went to bed at the station but during the night had regurgitating spells and complained of a severe headache; that during the next day at home his condition was the same and he could not retain anything in his stomach; that his wife observed an oblong vertical swelling near the base of his skull about one-half inch in height by two and one-half inches in' length; that in spite of his illness and suffering, he reported for work, as usual, around 6 o’clock that evening (November 28), complaining of headache and nausea; that shortly after his arrival at the fire station, while sitting on a chair, he suddenly slumped over in an unconscious condition; that he was immediately-taken to the Charity Hospital, where he died within five minutes after his admission, at 6:50 p.m.; that the Charity Hospital’s report shows that the cause of death was “cerebral hemorrhage”; and that an autopsy was not performed on his body.
 

 The testimony leaves no doubt that the deceased as a chauffeur handled this heavy fire equipment over a very rough street; that he had been subjected to what some of the firemen, who were on the machine, stated was the roughest ride they had ever had. None of them, apparently on account of the excitement, was able to say that he saw the deceased strike his head on anything during the ride.
 

 It is uncontradicted that upon the deceased’s return to the fire station his jovial attitude was changed to one of suffering and illness and he complained that on account of the rough ride and striking holes in the street the truck nearly jerked his head off. To one of the firemen he stated he struck his head. His wife testified that he told her the pumper “struck a rut and it felt like something struck my head and something happened to my head.” Miss Josephine Gennusa observed the swelling in the region of the base of his skull. The appearance of this swelling at the base of his skull leaves little doubt that the man was injured. From the time that he returned to the fire station, after the ride was over, until the time of his death he had constant headaches and periodic vomiting spells and gradually grew worse until he became unconscious and shortly thereafter passed away. There were no intervening injuries from the time of the ride until his death.
 
 *327
 
 This robust, healthy and jovial individual was reduced to a corpse within twenty-four hours after the ride.
 

 From the medical testimony of each of the .experts introduced by the plaintiff and the defendant, respectively, it appears that a person who has arteriosclerosis, particularly of the brain, suffers from a change in blood -pressure and dizzy spells, resulting from an inadequate supply of blood to the brain caused by the blood vessels or veins narrowing as they lose their elasticity and become hardened. It is only in exceptional cases that these symptoms are not evidenced.
 

 The deceased’s history shows that he at no time showed the slightest symptoms of being afflicted with arteriosclerosis, pellagra, scurvy, syphilis, of any venereal disease and that during the entire seventeen years in which he was employed by the fire department, and the sixteen years he was married, he enjoyed excellent health and never had any reason to consult or be treated by a doctor.
 

 The record shows that it is quite possible that due to the extremely rough ride caused by the ruts and holes in the street, the weight of the fire engine, the high pressure in the pneumatic tires, the fact that the driver had to have a strong and firm grip on the steering wheel, in order to properly manage the vehicle, and the presence of •the iron bar, the gas tank and the cap on the gas tank, immediately in the rear of the seat upon which the defendant sat while driving the truck, the deceased could have sustained a trauma or blow in the region of the base of his skull behind his left ear.
 

 One of the firemen stated that the deceased told him he struck his head when the engine hit a rut in the street. The deceased made the same statement to his wife.
 

 Miss Josephine Gennusa, a witness for the plaintiff, and the widow both testified that there was an oblong swelling or edema of about a half inch high by two and a half inches long on the left side of the deceased’s head in the region of the base of his skull, which caused him to hold his head to the right side and to turn his whole body when he wanted to look in a different direction.
 

 There was no history of a tumor, sebaceous cyst, or local paralysis and the defendant’s own medical expert, in his testimony, eliminated these as possible causes of the swelling. He also excluded local hemorrhage or rupture of blood vessels in the neck as a probable cause of the swelling, because such injuries would not have been accompanied by headache and vomiting spells, both of which are symptoms of cerebral hemorrhage. The medical experts agreed that swelling is characteristic of a trauma or force applied to a physical part.
 

 The medical experts differed in this respect: the defendant’s expert stated that it takes a very severe and violent blow to produce cerebral hemorrhage, whereas the other doctor stated that an ordinary blow properly applied to a vital spot was sufficient. Both doctors stated that in the absence-of an autopsy they could not state what caused the death of the deceased, but taking the diagnosis of the Charity Hospital
 
 *328
 
 that the deceased died from cerebral hemorrhage, they could not attribute the hemorrhage to arteriosclerosis for the reason that the history of the patient showed that he had no symptoms thereof, although it was possible in an exceptional case for a person to have arteriosclerosis without showing symptoms of the disease. There is not a scintilla of evidence in this record to show that this is an exceptional case. The defendant has offered no evidence of any history of this man upon which medical testimony can be based to show that he suffered from arteriosclerosis, scurvy, syphilis, or pellagra, all of which diseases weaken the cell walls of the veins and arteries, resulting in a tendency to hemorrhage.
 

 The Board offered in evidence the report of the Charity Hospital showing that the deceased died from a cerebral hemorrhage, the cause thereof being undetermined. This document and the medical expert’s testimony elicited by questions propounded by defendant’s counsel as to the probability of death from natural causes, is insufficient to overcome the testimony and evidence offered by the plaintiff showing that the deceased’s death resulted from injuries received while responding to the fire alarm.
 

 The trial judge reached the con- . elusion that the deceased died as a result of the injuries received while driving the fire engine to or from the place where the fire was reported, within the meaning of Section 12 of the statute, and it- is our opinion that the record fully justifies and supports his conclusion.
 

 For the reasons assigned, the judgment appealed from is affirmed.
 

 O’NIELL, C. J., does not take part.