FÉLIX C. HERNÁNDEZ MONTERO, Plaintiff and Appellant, *v.* ANTONIO CUEVAS VIRET, DIRECTOR, ETC. and ASSOCIATION OF EMPLOYEES OF THE GOVERNMENT OF PUERTO RICO, Defendants and Appellees.

No. 12732.     Decided June 27, 1963.

768

*Stanley L. Feldstein* for appellant. *E. Ramos Antonini* for Association of Employees of the Government of Puerto Rico. *J. B. Fernández Badillo, Solicitor General,* and *Nilita Vientós Gastón, Assistant Solicitor General,* for Antonio Cuevas Viret.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

The question for decision in this Court is the constitutionality of the procedure for determining the physical incapacity or disability of a public employee who is a member of the public institution "Association of Employees of the Government of Puerto Rico," provided by § 20 of Act No. 52 of 1921 (Sess. Laws, p. 374), as it stood at the onset of the disability involved in this appeal.

Let us state the facts in the case at bar which gave rise to the judgment appealed from. On August 9, 1955, the Acting Chief of the Commonwealth Police applied for the retirement of policeman Félix C. Hernández Montero, appellant herein, by reason of nonoccupational disability. Two days later Hernández filed with the Office of Personnel an application for pension for nonoccupational disability. On September 7 of that year he was examined by the physician of the System, Dr. Agustín M. Andino, who recommended a pension for nonoccupational disability and recommended that he be submitted to further medical examination within one year for the purpose of determining whether the disability was permanent.[1] On October 2, 1955, he was granted

---

[1] The diagnosis and recommendations of Dr. Andino were as follows:
"Diagnosis:
1. Severe, chronic, multiple, degenerative arthritis, affecting mostly the joints of the knees, the left elbow and the left shoulder.
2. Moderate-sized varicocele on left testicle, operated on.

the pension provided by Act No. 447 of May 15, 1951 (Sess. Laws, p. 1298), which was increased on July 1, 1957 by Act No. 80 of June 20, 1957 (Sess. Laws, p. 412).

After retiring from the Commonwealth Police he applied to the Association of Employees of the Government of Puerto Rico, of which he was a member, for the physical disability insurance benefits provided by said Association by operation of law. On March 26, 1956, the Association of Employees of the Government of Puerto Rico denied the application on the ground that the medical examination undergone by appellant disclosed that he was not actually incapacitated to discharge the duties of his office.

On December 18, 1957, he applied to the Police Superintendent for reinstatement in the service. The application was referred to the Personnel Board on February 17, 1958. On March 10, 1958, he was re-examined by the physician of the System, Dr. Rafael Coca Mir, who determined that appellant's disability was of a permanent character, which determination was communicated to him on March 12, 1958.[2]

3. Bilateral internal pterygiums.

Recommendations:

It is recommended that pension for nonoccupational disability be granted to him. The applicant shall submit to medical examination within a period of one year in order to determine the permanence of his disability."

[2] The diagnosis and recommendations of Dr. Rafael Coca Mir were as follows:

"Diagnosis:

1. Arterial hypertension of psychogenic type.
2. Simple exogenous obesity.
3. Multiple degenerative arthritis, at present in a state of partial remission.
4. Moderate-sized recurrent left varicocele.
5. Asymptomatic bilateral internal pterygiums.

Recommendations:

It is recommended that the nonoccupational disability pension be continued. Reinstatement in the service of the Commonwealth Police is denied on the ground that the applicant does not meet

In view of this medical determination, his reinstatement in the Police was denied; his nonoccupational disability pension continued to be paid to him, and it was decided that since his disability was of a permanent character he need not submit to periodical medical examinations. He did not appeal to the Board of Trustees from this decision of the Director of the Personnel Office who is the Administrator of the Retirement System.

On December 1, 1958, he filed in the Superior Court of Puerto Rico, San Juan Part, a petition for mandamus and collection of money, praying the court to order defendant Antonio Cuevas Viret, Director of the Office of Personnel, to reinstate him in his office of policeman, or, in the alternative, to render judgment against the codefendant Association of Employees for the amount of insurance allegedly owing to him from the date of his retirement to the date of the judgment, and further, to order said defendant to continue the periodical payments of such insurance in the future.

Codefendant Association of Employees of the Government of Puerto Rico moved for dismissal of the complaint alleging that it did not state a claim to warrant the granting of a remedy, since it failed to allege (a) that plaintiff was totally and permanently disabled to discharge his office, and (b) "that from the medical evidence of the physicians of defendant Association it appeared that he was totally and permanently disabled to discharge his office, and that, notwithstanding the medical evidence submitted to the Board of Directors of defendant by its physicians, the Board had denied plaintiff's request for payment of the insurance policy which he carried with the appearing party, defendant herein."

Codefendant Antonio Cuevas Viret, Director of the Office of Personnel, also moved for dismissal alleging that ac-

_____

the physical requirements necessary to belong to that body. This pensioner must not be submitted to periodical medical examinations because his disability is of a permanent character."

cording to a certificate submitted by Rafael Serra, Chief of the Retirement Division of the Office of Personnel, on October 2, 1955, that office granted a nonoccupational disability pension to petitioner therein; and that since his request for reinstatement in the Police service had been denied on the ground that he was permanently disabled and that he had been notified of the decision to that effect on March 12, 1958, he did not take any appeal and did not therefore have any claim against the Office of Personnel.

The foregoing motions for dismissal were granted and the appeal was accordingly dismissed in its entirety.

The trial court based its order granting the motion of Cuevas Viret to dismiss on the following circumstances: (1) the decision of the Personnel Board was favorable to appellant, as prayed for in his request; (2) the latter accepted it as final upon failing to timely move for reconsideration or to take an appeal; (3) the second medical examination performed by the physicians of the System ratified the determination of disability; and (4) the final character of the decision barred review by mandamus proceeding.

The dismissal as to the Association of Employees was based on the result of the report of its physicians which was adverse to appellant, considered in the light of the provisions of § 20 of Act No. 52 of 1921, as amended, and on the doctrine announced in *Arzola* v. *Loan Fund Association*, 72 P.R.R. 394 (Snyder) (1951).

The decision appealed from clearly shows that the trial judge, in full compliance with the letter of the law and with our opinions, and for that reason alone, felt that he was bound to dismiss and did dismiss a claim which deep in his conscience he thought was fair, reasonable and worthy. In part of his decision he stated as follows:

"In this case the petitioner has clearly been the victim of a grave injustice resulting from the interpretation of two statutes covering similar aspects in relation to the rights of a public

employee. On the one hand, the Personnel Board tells him that he is permanently disabled to discharge an office in the Commonwealth of Puerto Rico, and, on the other hand, the Association of Employees of the Government of Puerto Rico tells him that he cannot collect insurance because there are no signs or symptoms which incapacitate him totally and permanently for the office which he held in the Government of Puerto Rico.

"Having examined the provisions of § 20 of the Act—3 L.P.R.A. § 851—and the decision of the Supreme Court of Puerto Rico in the case of *Arzola* v. *Association, supra,* there is nothing we can do to prevent this result. The Legislature of Puerto Rico is bound to adopt proper measures for cases similar to that under our consideration. Not until the decision in the case of *Arzola* is modified or reversed, that case is the law in connection with the application of § 851 *supra.*"

The questions on appeal raised by the policeman, appellant herein, as stated in his brief, are the following:

"*Points discussed:*

I. The *Arzola* case should be reconsidered and overruled.
II. The due process of law has been violated.
III. The legislative power has been unconstitutionally delegated.
IV. The judicial power has been unconstitutionally invaded.
V. The complaint is not barren of necessary allegations.
VI. Plaintiff did not fail to exhaust the administrative reliefs."

I

Let us consider jointly the points marked I, II, III and IV as grounds for the theory of unconstitutionality of § 20 of Act No. 52 of 1921, as it stood at the onset of appellant's disability,[3] namely, as amended—for the eighth time—by

---

[3] It is rather difficult to determine, on the basis of the disclosures of the record, the date, even approximate, when appellant's disability acquired the character, condition or state of "total and permanent for the discharge of his office or employment in the Government." On the basis of the dates of the examinations performed upon him by Drs. Antonio Andino and Coca Mir, it must have been acquired between September 7, 1955 and March 10, 1958. Section 20 remained unchanged between both dates.

Act No. 133 of April 23, 1952 (Sess. Laws, p. 264). The most recent amendment—Act No. 101 of June 25, 1962 (Sess. Laws, p. 260)—does not affect the problem involved herein.

Act No. 52, approved July 11, 1921, created a public institution, of compulsory character—as amended by Act No. 150 of 1937 (Sess. Laws, p. 396)—for all the public permanent employees and officers of the Insular Government of Puerto Rico, denominated "Association of Employees of the Government of Puerto Rico"—as amended by Act No. 18 of April 23, 1954 (Sess. Laws, p. 142). Its purposes are: to stimulate savings among its members and to insure them against physical disability or death, to make loans, to provide them with homes and clinics for medical treatment for themselves and their families, etc. For such purposes or objects, § 1 of that Act—3 L.P.R.A. § 831—vested the directing body of that Association with the "necessary powers and . . . to prescribe regulations and to adopt the resolutions indispensable therefor."

By § 20, as of the effective date of Act No. 15 of April 21, 1927 (Sess. Laws, p. 134), which amended it for the second time, a death and physical disability insurance was created for the benefit of the members of the Association. Such disability would consist in "the total and permanent disability to discharge his office or employment in the Government[4] . . . either through accident or chronic or incurable disease not contracted by a dissipated and licentious life." The applicable text of § 20 *supra*—3 L.P.R.A. § 851—reads in its pertinent part:

"An insurance for death and physical disability is hereby created for the benefit of the members of this association. The former shall be verified by a death certificate from the Vital Statistics Registry in which it was registered. The latter, that is,

---

[4] The amendment made to § 20 by Act No. 101 of June 25, 1962, refers to the total and permanent impossibility to discharge "any office or employment in the Government."

the disability, is constituted by the total and permanent disability to discharge his office or employment in the Government of Puerto Rico, either through accident or chronic or incurable disease not contracted by a dissipated and licentious life. Said insurance shall be applied for in writing to the board of directors before the affected official or employee ceases in the discharge of his office or employment, and in no case after the lapse of fifteen (15) days from the date of the ceasing of such official or employee, and the said board shall direct the making of medical examinations relative to the physical conditions of the applicant, and in case it appears that the applicant is really disabled, he shall be entitled to the corresponding insurance as follows: The insurance shall be divided into two classes which shall be known as first and second class. Such employees as shall express their willingness to pay a monthly assessment of one (1) dollar for each death or disability shall belong to the first class, and to the second class shall belong such as pay an assessment of fifty (50) cents for the said reasons; *Provided,* That in the case of any member of the association who is insured with, or has accepted the benefits of, any other public, quasi-public or private society, association or institution, and to whom a pension, insurance, or any other benefit is granted due to physical disability or because of an accident which disables him, partially or totally, temporarily or permanently, for holding his office or employment or for practicing his profession, such decision or declaration of benefit shall in no way affect or prejudge the application which said employee may file with this association for said disability or accident, which application shall be strictly governed by the laws thereof and shall be subject to the decision which the board of directors may render in the case, relative to the said employee's total and permanent disability, *and neither the board nor the courts, as the case may be, shall admit any other evidence than that specifically prescribed by sections 831–859 of this title."* (Italics ours.)

Section 25 of Act No. 52, as amended by Act No. 54 of June 10, 1954, provides in its pertinent part:

". . . any member enjoying the benefits of this Act who may petition that his insurance . . . be granted him on account of total permanent disability for work, shall be submitted to a

medical examination following the same procedure as provided for employees applying for admission, and such petition shall require the approval of the Board of Directors."

The procedure "as provided for employees applying for admission" consists, according to the same § 25, in an application for membership addressed to the Chairman of the Board of Directors together with a photograph and a birth or a baptismal certificate, or, in default thereof, any other document of legal sufficiency to prove his age. Further on, according to its text:

"The Chairman shall refer to the physician of the Association the application and other documents mentioned in the preceding paragraph so that he may make such examination or examinations of the applicant as he may deem proper, filling out, to such end, the medical certificate blank form the Association shall furnish him, and reporting to the board, as soon as possible, the result of his work. The Board of Directors, at its next meeting after the receipt of said report, shall pass upon the application and shall notify the applicant and the department or office in which he works, of its decision, directing that the corresponding deductions be made for the savings fund and for insurance, according to the applicant's petition, if said petition has been approved. If an application for admission is rejected, it shall be sufficient to so notify the interested party, and he shall only be covered by the savings and loan benefit."

According to the 1954 amendment to § 25, the death or disability insurance was made voluntary for every newly appointed employee.

In *Arzola* v. *Loan Fund Association, supra,* the policeman was a member of the Association and the corresponding amount for the insurance was deducted from his salary. In December 1942, while he was engaged in the performance of his duties as a policeman, he received a bullet wound. The physician of the Insular Police determined that he was physically incapacitated from continuing to perform the duties of a policeman, and he was accordingly separated from

his job. In June 1943 he requested from the Association payment of his policy for physical disability, pursuant to § 20 of Act No. 52. Arzola was examined by the physician of the Association who arrived at the conclusion that his ailment was temporary and would disappear under certain conditions. In view of the adverse medical report, the Association denied his application. He sued the Association for payment of the disability insurance. At the trial the court refused to consider the testimony of the other physicians as to the nature of plaintiff's disability. It rendered judgment against him, based solely on the negative certificate of the physician of the Association, holding that it was bound by the adverse medical report to so decide the case in view of the provisions of § 20 to the effect that (a) when a request for payment because of physical disability is made, the physician of the Association shall examine the applicant and certify his physical condition, and that (b) on the issue of total and permanent disability, the Board or the court, as the case may be, shall not admit any other proof than that specifically provided by Act No. 52.

Appellant Arzola did not raise in direct and specific terms, as is done in the case at bar, the unconstitutionality of § 20 of Act No. 52 or of any other statutory provision. He assigned as errors the holdings of the trial court (1) that it could not admit and consider the testimony adduced by the plaintiff to prove his physical disability, and (2) that the sums deducted for insurance were public funds which could be disposed of by the Legislature as it chose.

We finally disposed of that case in the following terms:

"We need not decide if we would follow the cases involving private insurance contracts in an appropriate case. This is not a case involving a clause in a contract between private parties as to which our statutes are silent. Under those circumstances perhaps we would be free to determine that public policy is violated by a clause in the contract like that found in § 20. But

here we have a specific expression by the Legislature itself in § 20 as to the controlling public policy on this matter. And although the discounts may be voluntary and the public employees may have certain vested rights therein, these funds are in the custody of 'a public institution'. Section 1 of Act No. 52, as amended. The plaintiff voluntarily joined the disability insurance system of the Association when the language in controversy was already embodied in § 20. Under these circumstances, we fail to see on what basis we are authorized to set aside the public policy established by the Legislature in § 20 as a condition precedent for the disbursement of these funds and to establish in its place a contrary public policy by judicial fiat.

"We agree with the lower court that it was compelled to decide the case in accordance with the requirements of § 20. Under that Section the report of the physician of the Association is the only evidence which can be considered on the issue of physical disability. Since his report was adverse to the plaintiff, the lower court did not err in entering judgment for the Association."

Before discussing the *Arzola* case, let us examine briefly Act No. 52 of 1921 and other related acts as respects the granting or recognition of rights or benefits in favor of the employee covered thereunder. We have already seen that the public institution denominated Association of Employees of the Government of Puerto Rico was originally created by Act No. 52 of 1921, for the exclusive protection and benefit of its members, to stimulate savings among them, to insure them against physical disability or death, to make loans, to provide them with homes and clinics for medical treatment for themselves and their families, and to promote "by all available means and resources the betterment and individual and collective progress of the members thereof in the economic, moral and physical orders."

In order to carry out the purposes of § 1 of that Act, it declared that its directing body was granted the necessary powers and authority to prescribe regulations and to

adopt the resolutions indispensable therefor. By § 19 of that Act that body was vested, in general terms, with powers to "prepare such rules and regulations as may be necessary for the application of this Act."[5]

The conclusive expression of the Legislative Assembly of Puerto Rico, through Joint Resolution No. 39 of May 1, 1929—3 L.P.R.A. § 860—as to the nature of that Associa-

---

[5] Forty-one years elapsed without any regulation having been adopted by the Association. It was the Board of Directors of 1961 and 1962 the one which for the first time adopted a regulation on January 8, 1963.

Judging by the experience in the activities of that Association, the development of its financial operation has been enormous. As of June 30, 1962, its capital amounted to $35,700,000. Of that amount $28,842,000 represented accumulated savings and $6,858,000 accumulated dividends. However, its system of death and physical disability insurance, possibly the cardinal reason for its creation, has not accomplished fully its purposes and objectives. In the annual report dated October 1, 1962, submitted to this Court by the delegate of the Judiciary Branch to the Assembly of Delegates of that Association and a member thereof, informed in its pertinent part:

"The situation of the system of life and physical disability insurance administered by the Association continues to be critical. (Yet, its loan service amounts to $34,097,871.) The policies continue to be paid with great delay after the claims for payment are made. As of June 30, 1961, 266 policies had not been paid for lack of funds. Two hundred twenty-four other policies were approved in the course of the year 1961-62. This makes a total of 490 policies. Of this total 175 policies were paid during the year 1961-62, so that as of June 30, 1962, 315 policies were still unpaid; that is, 49 policies more than in the past year. The value of all those policies exceeds $1,700,000. The reasons for this situation are known to all of you.

"The Association again brought up the problem of the insurance system before the Legislative Assembly. On this occasion we urged that the Act which created our institution be repealed and that another statute be enacted instead to facilitate the insurance system and correct the flaws therein. Our efforts were unsuccessful. Yet, this year the Legislative Assembly enacted legislation which became law and improved the insurance system."

The situation of the insured is disquieting, frightful. On the one hand, a type of system for the definitive resolution of his case which may defeat his vested right without hearing him; on the other hand, hardly any opportunity to collect his insurance when it is granted. Three hundred fifteen unpaid policies is the picture of 315 physically disabled persons who are unable to collect their insurance.

tion and of its funds, was in the sense that it was and is "a cooperative plan operating under the auspices of the Government, through legislation," and that its funds "belong exclusively to the members of the Association."

As we stated in *Buscaglia, Treas.* v. *Tax Court*, 67 P.R.R. 532, 544 (Todd, Jr.) (1947), those funds and the dividends thereof do not have the character of public funds of which the Government may dispose as it chooses. There we recognized that the right to full reimbursement of the savings and dividends constituted "vested rights in the employee, and we cannot presume that the Legislature would, if it could, change the statute to deprive him of said rights."

In *Denis* v. *Savings and Loan Fund Ass'n, etc.*, 75 P.R.R. 798, 802 (Snyder) (1954), we said among other things:

". . . We assume that the same considerations governing delegations of legislative power in the ordinary case apply to the powers of the board to manage the insurance funds involved herein, *in which those who have contributed thereto have certain vested rights.* [Italics ours.] *Cf. Arzola* v. *Loan Fund Association*, 72 P.R.R. 394, 396; *Buscaglia, Treas.* v. *Tax Court, Riera, Intervener*, 67 P.R.R. 532, 542; *Díaz* v. *López*, 47 P.R.R. 512; *García* v. *Soltero*, 65 P.R.R. 281."

We have no doubt that if the medical diagnoses and conclusions reached by Drs. Andino and Coca Mir as to the physical condition of appellant were correct, the latter had acquired the right to receive the amount of insurance for permanent disability to discharge the functions of his office, which was precisely the reason for his separation from the Police.

However, the phrase "and the board or the court, as the case may be, shall not admit any other proof than that herein specifically provided," which was introduced in § 20 by Act No. 150 of May 15, 1937, constitutes an absolute command of such a prohibitive nature that it makes the Board of Directors of that Association as well as the courts

of justice mere sacristans of the amen of the physician of the Association. This physician, appointed and paid by the Association, has absolute freedom to examine physically the member who requests the payment of the disability insurance, without the intervention of any other physician and without being bound by any administrative or legislative rule, standard or directive in the process of determining the state or condition of disability. His "diagnosis-determination," raised by the law to the category of sacred taboo in all possible analyses, decides once and for all, unappealably, the member's request.

In other words, the legal authority apparently conferred by the Act in these cases to the Board of Directors "to prescribe regulations and to adopt the resolutions indispensable therefor," is exercised exclusively by the physician of the Association. After issuing the "diagnosis-determination" there is nothing to doubt, discuss, nor agree, nor decide; the Board may not reject it no matter how absurd, mistaken, arbitrary, doubtful, erroneous, unfair, or incorrect it may seem to be or actually is; the courts cannot permit that it be challenged by other physicians nor much less set it aside, nor even modify it cosmetically. The court to which resort is had in such cases by a member of the Association who is oppressed by the misfortune of a total and permanent disability, from whose salary the insurance quotas have been deducted, and who, as stated by the trial judge, "has clearly been the victim of grave injustice," in view of an adverse diagnosis, can only say what the distinguished trial judge precisely said with utmost regret in his sense of justice and clear conscience: ". . . There is nothing we can do to prevent this result." In other words, to proclaim a chaotic state of judicial impotence in these matters.

As stated in *People* v. *Galleti Rodríguez, ante,* p. 275, "science is considered nowadays a verified probability, contrary to the former criterion which considered it an estab-

lished truth." In the verification of a probability which may be the controlling cause of a vested right, the claimant or presumptive claimant of such right must be heard, must have his day in court and the opportunities necessary to adduce evidence in his behalf, and should be afforded the protection and minimum securities for the enjoyment of such right. Why should he be deprived of the fundamental right to cross-examine the physician who submitted the report which prevents him from receiving the insurance benefits?

■ A judicial proceeding such as that brought by appellant before the Superior Court, the outcome of which is practically anticipated, or the outcome of which is fatally and absolutely controlled by a medical determination, may be anything but a due process of law. It will constitute, by the virtuality granted to it, an undue delegation of the exercise of the judicial power in favor of the physician who by his diagnosis has determined the rights acquired by the member to enjoy his insurance.

This is contrary to Art. V of our Constitution which provides that "The judicial power of Puerto Rico shall be vested in a Supreme Court, and in such other courts as may be established by law." It violates, in a certain sense, the freedom of organization—§ 6 of Art. II; the right not to be deprived of his property without due process of law, the impairing of the obligations, contractual to a certain extent, which Act No. 52 itself recognizes to the member who has joined the disability or death insurance—§ 7 of Art. II.

The meaning of that phrase in § 20, which is not a simple rule of evidence, must be understood objectively. Its positive function has consisted so far in eliminating virtually the courts of justice from any possible intervention in cases such as the present, or, in the alternative, in permitting them to intervene for the sole purpose of confirming the diagnosis-determination of the physician of the Association.

What seems regrettable, in the light of a sound criterion of justice, is that by those expressions of § 20—including that which deprives of every authority the determinations made by other government agencies or institutions on the same fact of the member's disability—the courts are absolutely deprived of any power to make: (1) declaration of nullity of the administrative action, based on the report of the physician of the Association, by an erroneous application of the law; (2) declaration of nullity of the action because the medical report is not supported by the member's physical condition; (3) declaration of nullity because the result of the examination which served as the only basis for the action is clearly arbitrary, false or erroneous; (4) declaration of nullity because the diagnosis was not based on any physical examination of the member, or the examination has been contrary to the common and usual medical standards or to the only ones permitted by the case.

In *Sacarello* v. *Retirement Board*, 75 P.R.R. 253, 278 and 282 (1953), in the illuminating opinion of our brother Mr. Justice Belaval it was said, among other things:

"When dealing with a statute that is silent concerning subsequent judicial review, silence is not necessarily to be construed as a denial 'of the power of the courts . . . , to grant relief in the exercise of the general jurisdiction . . . conferred upon them.' *Estep* v. *United States*, 327 U.S. 114, 571, 90 L.Ed. 567, 571 (Douglas, writer of the opinion, Murphy, concurring in a separate opinion, Rutledge, concurring in a separate opinion, Frankfurter, concurring in the result in a separate opinion, Burton, with whom Chief Justice Stone concurs, dissenting) (1946). On the contrary, it should be construed that 'the responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts . . . by the statutes establishing courts and marking their jurisdiction.' *Stark* v. *Wickard*, 321 U.S. 288, 307–309, 88 L.Ed. 733, 748 (Reed, writer of the opinion, Black, concurring without opinion, Frankfurter, dissenting in opinion) (1944). As to any possible deprivation of a constitutional right, the

language used by concurring Justice Murphy, in *Estep* v. *United States, supra,* at pp. 127–129 U.S. 575–576 L.Ed. (1946): 'Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority,' leaves no room for doubt as to the obligation of the traditional courts to interfere at any time in favor of a party whose constitutional rights might have been impaired."

As it appears from footnotes 1 and 2, the physical condition of appellant Hernández Montero in 1955 and 1958 was serious. In 1955 Dr. Andino diagnosed a severe, chronic, multiple, degenerative arthritis, affecting mostly the joints of the knees, the left elbow and the left shoulder; in 1958, according to Dr. Coca Mir, the multiple degenerative arthritis persists; he has bilateral internal pterygiums which subsist in 1958; he had recurrent moderate-sized left varicocele; arterial hypertension of psychogenic type in 1958, and simple exogenous obesity. The first of those physicians recommended the granting of a nonoccupational disability pension; the second recommended three years later, namely, in 1958, (a) that payment of the nonoccupational disability pension be continued, (b) that the reinstatement in the service of the Commonwealth Police be rejected on the ground that the applicant did not meet the physical requirements necessary to belong to that body, and (c) that he need not submit to periodical medical examinations because his disability was of a permanent character. Against this not too enviable picture of health, which § 20 forbids be shown to the trial judge, we have the medical report of the physician of the Association in which it appears that the policeman is not suffering from physical disability to discharge his office, but to which the Commonwealth Police did not give credit and on the basis of which Hernández Montero applied for reinstatement in that body. As stated by the learned trial judge:

"On the one hand, the Personnel Board tells him that he is permanently disabled to discharge an office in the Commonwealth of Puerto Rico, and, on the other hand, the Association of Employees of the Government of Puerto Rico tells him that *he cannot collect insurance because there are no signs or symptoms which incapacitate him totally and permanently for the office which he held in the Government of Puerto Rico.*" (Italics ours.)

As stated in *Sacarello, supra,* ". . . this is a typical case of the forfeiture of a right without due process of law" (at 274).

■ Under our constitutional system, the Legislative Assembly cannot prevent the courts of justice, directly or indirectly, from exercising their reviewing powers in cases in which action has been taken or may be taken by the administrative agencies contrary to the mandatory constitutional provisions.

Let us consider next the challenge of the case of *Arzola* v. *Loan Fund Association,* the facts of which we have recited. In that case we affirmed the judgment of the former District Court, San Juan Section, rendered on April 13, 1949, dismissing the complaint in the belief that § 20 was binding on it, in that part which provides that the report of the physician of the Association is the only evidence which can be considered. The complaint was filed in December 1944. We decided it on April 19, 1951 accepting as valid the said phrase of § 20 as being "a specific expression by the Legislature itself . . . as to the controlling public policy on this matter," and because the funds with which the insurance was paid were "in the custody of a public institution." We had no authority to remedy the situation of policeman Arzola, plaintiff therein, in stating: "Under these circumstances—[among which was the fact that Arzola voluntarily joined the insurance] 'when the language in controversy was already embodied in § 20'—we fail to see on what basis we

are authorized to set aside the public policy established by the Legislature in § 20 as a condition precedent for the disbursement of these funds."

Evidently, in deciding the appeal on the erroneous assumption that the lawmaker had tied our hands and that we were therefore bound to consider fair and correct the judgment appealed from, we did not consider, indeed because it was not alleged before us, that under the provisions of the Federal Constitution or under those of our Organic Act of 1917, any law or part of law which (a) deprived a person of his property without the due process of law or denied to him the equal protection of the laws, (b) impaired the value of contracts, (c) took the private property or rights for the benefit of a public institution, without just compensation, (d) transferred, in any manner whatsoever, the judicial power vested exclusively "in the courts and tribunals of Puerto Rico" to other persons or entities, was invalid.

■ Nor did we consider that the insurance which came into play, on the basis of the deductions made from the salary of every insured employee, was a contract of adhesion; that the validity or performance of the contracts may not be left to the discretion of persons extraneous thereto; that a party to a contract—the defendant Association—cannot be judge and party in a controversy on its validity or performance.[6]

---

[6] Since the insurance contract is, as a general rule, a business activity within the mercantile sphere, it would not be improper to bear in mind the principles of good law embodied in § 88 of our Code of Commerce, 1932, which reads thus:

"Commercial contracts shall be executed and complied with in good faith according to the terms in which they were made and drafted, without evading the honest, proper, and usual signification of written or spoken words with arbitrary interpretations, nor limiting the effects which are naturally derived from the manner in which the contractors may have explained their wishes and contracted their obligations."

■ The legislative work should respond or conform to the constitutional standards. If it violates them openly, the legislative work is of no avail; it does not bind anyone.

■ A legislative provision having the scopes which we have pointed out cannot be validly characterized as a "condition precedent" for the co-operative or mutual insurance contract created by Act No. 52. Should we accept it as such, the payments of such insurance would depend on the criterion of persons extraneous thereto. The directing body of the Association, as respects the insurance, would be constituted (as it seems to be actually constituted) by the physician of the Association. The verification of the total and permanent physical disability is what should be considered as a condition precedent for the payment of the insurance. Such verification may and should be made before the courts of justice in the ordinary civil proceeding provided by our Rules and subject to our Law of Evidence.

The language, manifestly unconstitutional, of the phrase contained in § 20 of the Act, we repeat, is not binding on the insured.[7]

---

[7] The due process of law requirements are applicable both to judicial and administrative matters. *Shields* v. *Utah Idaho C. R. Co.*, 305 U.S. 177; *Yamataya* v. *Fisher*, 189 U.S. 86; *People* v. *Belcastro*, 190 N.E. 301, 92 A.L.R. 1223. The due process of law requires that the proceedings must be adapted and appropriate to the case in which they are used; that they be just to the parties to be affected; and that they must be adapted to the ends to be attained. *Hagar* v. *Reclamation Dist.*, 111 U.S. 701; *Federal Communications Comm'n* v. *Station WJR*, 337 U.S. 265, cited in 1 Davis, Administrative Law Treatise 435, § 7.07. The due process of law clause guarantees that in the judicial or quasi-judicial proceedings the trier of facts shall be an impartial tribunal, legally constituted; that he shall not make determinations without notifying the parties or without giving them an opportunity to be heard; and that the proceedings at the hearings shall be compatible with those of a fair and impartial trial. *Cf. Kessler* v. *Strecker*, 307 U.S. 22; *Morgan* v. *United States*, 304 U.S. 1; *St. Joseph Stockyards Co.* v. *United States*, 298 U.S. 38; *State ex rel. Hurwitz* v. *North*, 264 S.W. 678, *aff'd*, 271 U.S. 40; *Alemañy* v. *Industrial Commission*, 63 P.R.R. 578 (1944); *Figueroa* v. *Industrial Commission*, 64 P.R.R. 598 (1945); *Ledesma, Administrator* v. *District Court*, 73 P.R.R. 379 (1952); *Eastern Sugar Associates* v. *Sugar Board*, 77 P.R.R. 354 (1954).

It is stated in the opinion of Arzola that the cases cited by appellant are not applicable since:

(a) they involve clauses in private contracts between an insurance company and an insured on which the legislation is silent, or

(b) they involve state constitutional provisions which are not contained in our Organic Act.

In the cases of:

1. *Penquite* v. *Dunn*, 256 Pac. 130 (1927).

2. *Meyer* v. *Board of Trustees of Firemen's Pension & Relief Fund*, 6 So.2d 713, the contract involved is not a private contract between an insurance company and an insured. They deal with controversies similar to that in the case at bar. The other cases deal with contracts between the insured and private companies or labor unions. All the cases cited, except one, *cf. Board of Trustees* v. *McCrory*, 116 S.W. 326 (Ky. 1909), are contrary to the opinion of this Court in the *Arzola* case. The other citation is also to the contrary, *cf.* 6 Willinston, Contracts 4864–68, § 1723 (1938). In the supplement of the same volume of Willinston's work the case of *American Casualty Co.* v. *Horton*, 152 S.W.2d 395 (1941), is cited as a modification of the doctrine announced.

In the cases dealing with a limitation as to the admissible evidence, the courts rejected the allegations on the exclusiveness of this evidence.

In *López* v. *Planning Board*, 80 P.R.R. 625, 638 (Saldaña) (1958), we said:

"Undoubtedly, the Legislature can not delegate arbitrary or unlimited powers to administrative agencies. The statute must prescribe a definite standard which may serve as a guidance and limit the use of delegated power, whether of rule-making or adjudication. The statute need not prescribe fixed and definite standards. Given the trend of modern social and economic conditions, (1) the Legislature can not consider the details of the government programs: its prime function is to establish general

patterns, for an attempt to take part in the details would be only half successful; (2) frequently it is necessary to plan certain programs which require the constant supervision, the technical knowledge and specialized experience of administrative agencies; and (3) no such program can be carried out unless a broad margin of discretion is granted to those agencies. For that reason, the delegation of powers can be constitutionally made on the basis of broad and general standards."

As to the possible argument that § 851 (3 L.P.R.A.) fixes a standard or guide in saying that ". . . the latter, that is, the disability, is constituted by the total and permanent disability to discharge his office or employment in the Government . . . either through accident or chronic or incurable disease not contracted by a dissipated and licentious life," we would have to answer that this would be a fact to be adjudicated, a thing which has not been done and for which an opportunity has not arisen. But even then, this phrase is not by itself an appropriate standard. See *Schechter Corp.* v. *United States*, 295 U.S. 495.

We do not believe that the point submitted by the Solicitor General in the sense that this Court has repeatedly upheld the constitutionality of this section, specifically determining that there are sufficient standards or policy expressed in that section by what is said in *Denis* v. *Savings and Loan Fund Ass'n, supra,* and in *Arzola* v. *Loan Fund Association, supra,* can be sustained.

In the case of *Denis* v. *Savings and Loan Fund Ass'n, supra,* the clause of the law in controversy was § 20(d). This clause fixes and determines in detail the standards and guides to be followed. This clause 20(d) could be taken as a standard of what should have been done and was not done as to the section pertinent to the insurance disability.

■ Nonetheless, we must bear in mind that the Legislature is without constitutional power to enact a confiscatory statute as well as to delegate to an administrative body

the power to determine rights in such a way as to be confiscatory. *Gegiow* v. *Uhl*, 239 U.S. 3; *St. Joseph Stockyards Co.* v. *United States*, 298 U.S. 38 (52); *Estep* v. *United States*, 327 U.S. 114; *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U.S. 123.

■ In view of the foregoing, we reverse the case of *Arzola* v. *Loan Fund Association*, 72 P.R.R. 394 (Snyder) (1951), and declare that the *"Provided"* clause of the first paragraph of § 20 of Act No. 52 of 1921, the text of which is inserted at the preceding p. 774, is invalid as being unconstitutional.

## II

In the light of the foregoing, we hold that the complaint filed on December 2, 1958 states facts sufficient to warrant the granting of the remedy sought with respect to codefendant Association of Employees of the Government of Puerto Rico.

In view of the alternative form of the action exercised and of the disposition which we will make of the case, we need not pass on point VI as to whether or not appellant failed to exhaust the administrative reliefs.

As to codefendant Antonio Cuevas Viret, as Director of the Office of Personnel, actually there is no serious controversy in this appeal. That Office recognized appellant's disability and accepted the medical diagnoses determining such incapacity at different times. Appellant himself says in his brief (p. 18) that he requested his reinstatement "by way of confirmation of his ability."

The judgment appealed from will be affirmed insofar as it dismissed the complaint as to codefendant Antonio Cuevas Viret, Director, etc., but it will be reversed insofar as it dismissed the complaint as to codefendant Association of Employees of the Government of Puerto Rico, and the

case will be remanded to the Superior Court, San Juan Part, for further proceedings consistent with this opinion.